INGRAHAM, P. J., LAUGHLIN, CLARKE and SCOTT, JJ., concurred.

Exceptions overruled, with costs, and judgment ordered for defendant, with costs. Settle order on notice.

---

SARAH C. GOODHUE, Appellant, Respondent, *v.* MARGARET S. E. CAMERON, Respondent, Appellant.

First Department, January 6, 1911.

Real property — agreement restricting use of lands — when wife of owner not necessary party — principal and agent — execution of restrictive agreement by attorney in fact — ratification by principal — acknowledgment of instrument executed by attorney — presumption in case of ancient deed — evidence — ancient deed executed under lost power of attorney — when restriction agreement runs with land — estoppel of subsequent grantees — acts and conveyances locating boundary line — after-acquired title — when not covered by restriction agreement — equity — violation of restriction agreement — injunction denied — costs — remedy at law.

The wife of one of several tenants in common is not a necessary party to a contract executed by her husband with the other owners restricting the nature of the buildings to be erected upon the property and the use to be made thereof, for during the husband's life her interest is inchoate.

A statement in such restriction agreement that "the several parties hereto are owners in fee simple" means no more than that the fee was vested in the parties to the agreement, and does not purport to define the precise interest of the several owners.

A part owner of lands may ratify a restriction agreement executed by his attorney in fact, and convey the property subject to the restriction.

An owner of lands by covenanting that he and his wife are seized of lands conveyed subject to a building restriction ratifies the restriction agreement and cures any defect in the execution thereof by his agent. And the grantee and his successors are bound by the restriction where he accepted the title subject thereto.

A commissioner of deeds when taking the acknowledgment to an agreement restricting the use of lands made by the agent of the owner is not required to certify that he knew that the agent was attorney for the owner, or that the power of attorney was exhibited and known to him. He need only certify

that the person executing the agreement was known to him to be the person described in and who executed the instrument.

The execution of a valid power of attorney will be presumed in favor of an ancient deed purporting to be executed by attorney.

An agreement restricting the use of lands is a conveyance of an interest in land, and when more than thirty years old is to be treated as an ancient deed. Hence, a certified copy thereof is admissible in evidence although the power of attorney to execute it be not produced.

Moreover, that such power of attorney actually existed may be inferred from the fact that the owner when subsequently conveying the lands acknowledged that they were subject to the agreement purporting to be executed by his attorney. And even if not evidence of the existence of the power of attorney, such conveyance acknowledging the restriction agreement is an adoption and ratification of its execution by the agent on behalf of the owner and, relating back to the time of the agreement, is as effectual as if original authority had been given.

Where a series of conveyances were all made subject to an agreement restricting the use of the lands, the successive owners hold the lands charged with the restriction and are estopped from denying its validity.

Where deeds referred to a map of the common lands of a city filed in the county clerk's office, and also to a particular survey annexed, it will be presumed that the particular survey is a copy of that part of the maps of common lands of the city relating to the property conveyed.

Title to lands examined, and *held*, that by the acts of parties during sixty years, and by their conveyances, there was a practical location and settlement of the boundary line conclusive upon subsequent owners.

Where a person purports to convey lands to which he has no title, his deed operates by way of estoppel if he subsequently acquire title to the land purported to be conveyed.

But an agreement restricting the character of buildings to be erected upon certain described lands and the use thereof, does not apply to another parcel not included in the agreement acquired by a party to the agreement subsequent to its execution.

Where a defendant proposes to erect a building which will violate a restrictive covenant which covers only one-quarter of the plot, the other portions being free from the restriction, and it appears that the plaintiff, an adjoining owner, will not suffer any greater damage or annoyance if the building be erected on the entire plot rather than upon the unrestricted portion only, while the defendant will suffer serious loss if the building be confined to the unrestricted portion, equity will not restrain the erection of the building on the unrestricted portion, but will leave the parties to their legal remedy.

When it is clear that an injunction will be of no benefit to the plaintiff and will be a hardship to the defendant, it will be denied.

But where the defendant is violating a restrictive agreement, the dismissal of a suit for an injunction should be without costs, and without prejudice to an action at law for the breach of the agreement.

CROSS-APPEALS by the plaintiff, Sarah C. Goodhue, and the defendant, Margaret S. E. Cameron, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 6th day of December, 1909, upon the report of a referee dismissing the complaint upon the merits.

*John G. Milburn*, for the plaintiff.

*Peter B. Olney*, for the defendant.

Judgment affirmed on opinion of the referee, without costs.

Present — INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN, MILLER and DOWLING, JJ.

The following opinion was written in this case and in the case of *Morgan* v. *Cameron*, tried before the referee at the same time:

CHARLES F. BROWN, Referee:

These cases present precisely the same question and the decision in each depends upon the same facts. Having been tried together this opinion applies to each case.

The defendant contests the validity of the restriction agreement on two grounds, *first*, that it is not signed by Anna Vernon Murray, wife of John R. Murray, Jr., and is, therefore, void for lack of consideration ; *second*, that the acknowledgment is defective, and as the original agreement was not produced a certified copy from the record in the register's office was not admissible in evidence.

Neither of these objections can be sustained. The first point is based on the assumption that Anna Vernon Murray was an owner in fee simple of a part of the restricted territory. It is argued that the agreement so recited, and that as the plaintiffs base their cause of action on the agreement, they cannot contradict its terms ; that Anna Vernon Murray not having signed the instrument, the mutual covenants failed and with it the consideration.

I disagree with the learned counsel in their construction of the agreement. I think the expression " Whereas the several parties hereto are owners in fee simple " means no more and was intended to mean no more than that the fee simple of the property described was vested in the parties to the agreement.

The agreement did not define what the precise interest of each party was, but recited only the fact that the whole ownership was vested in those who made the agreement.

Certainly the expression does not necessarily mean what the defendant claims, and at least it is open to inquiry and construction. Interpreted as I interpret it, it is plain that Anna Vernon Murray's signature was not necessary to the validity of the contract. She was the wife of John R. Murray, Jr., and her interest in the property was inchoate. Had her husband died and had she acquired a vested estate of dower in a part of the property prior to its conveyance to Zabriskie a different question would have arisen. But there is no proof to show whether or not she survived her husband and we know that she was his wife on February 8, 1853, when the property on Madison avenue between Thirty-fourth and Thirty-fifth streets and 100 feet deep was conveyed by her husband and herself to Martin Zabriskie and by the terms of that conveyance declared to be subject to the restriction agreement.

It is established as a fact, therefore, by the testimony that Anna Vernon Murray had no vested interest or estate in the land at the time the restriction agreement was executed, and her signature, therefore, was not necessary to its validity.

This conclusion renders it unnecessary to consider what would have been the effect of the provision in the deed to Zabriskie which declared that the property was conveyed subject to the restriction agreement, had that agreement been void for the lack of Anna Vernon Murray's signature. It was plainly within the power of John R. Murray, Jr., to ratify the execution of the agreement by John R. Murray, his attorney, and convey the property subject to the restriction created by the agreement. To that extent the provision of the deed to Zabriskie was valid and effective.

The covenant that John R. Murray, Jr., and his wife were seized of the lands conveyed subject to the restriction, and the acceptance by Zabriskie of the title subject to the restriction had not only the effect of ratifying the agreement by John R. Murray, Jr. (if execution on his behalf was in any respect defective), but also of subjecting the property to the restriction as against Zabriskie and his grantees, including the defendant. (*Trustees* v. *Lynch*, 70 N. Y. 440.)

I am also of the opinion that the certificate of acknowledgment to the agreement is not defective and that the certified copy was properly admitted in evidence.

It was provided by 1 Revised Statutes, 758, section 9, that: "No

acknowledgment of any conveyance having been executed shall be taken by any officer unless the officer taking the same shall know or have satisfactory evidence that the person making such acknowledgment is the individual described in and who executed such conveyance."

By section 15 (1 R. S. 759) it was provided that: "Every officer who shall take the acknowledgment or proof of any conveyance shall endorse a certificate thereof, signed by himself, on the conveyance, and in such certificate shall set forth the matters herein before required to be done, known or proved on such acknowledgment or proof," etc.

The certificate of the commissioner of deeds on the restriction agreement complied with these provisions.

The commissioner was not required to certify that he knew that John R. Murray was the attorney for John R. Murray, Jr., or that the power of attorney was exhibited and known to him. (*Lovett* v. *Steam Saw Mill Assn.*, 6 Paige, 54; *Johnson* v. *Bush*, 3 Barb. Ch. 240.)

The cases cited by the learned counsel for the defendant are not in point.

In *Fryer* v. *Rockefeller* (63 N. Y. 268) the certificate failed to state that the parties acknowledging were known to the officer to be the same persons described in and who executed the instrument.

To the same effect is *Paolillo* v. *Faber* (56 App. Div. 242) and *Freedman* v. *Oppenheim* (80 id. 488).

In *Irving* v. *Campbell* (121 N. Y. 353) the certificate failed to state the place of residence of the subscribing witness.

In *Bradley* v. *Walker* (138 N. Y. 291) the certificate did not state that the wife acknowledged on a private examination separate and apart from her husband that she executed the instrument freely and without fear or compulsion from him.

In all these cases the officer taking the acknowledgment failed to certify facts required by the Revised Statutes to be certified at the time the instruments were executed.

In the case at bar the person executing the restriction agreement was John R. Murray and all that the statute required was that the commissioner taking the acknowledgment should certify that John R. Murray was known to him to be the person described in and who executed the instrument.

The power of attorney was necessarily contained in a separate instrument which would have been required to have been separately acknowledged in order to be recorded.

While such instrument has not been produced and no proof given that it ever existed, the authorities support the proposition that the execution of a valid power of attorney will be presumed in favor of an ancient deed purporting to be executed by attorney. (*Ensign v. McKinney*, 30 Hun, 249; *Doe* v. *Phelps*, 9 Johns. 170; *Doe* v. *Campbell*, 10 id. 475; *Robinson* v. *Craig*, 1 Hill Law Rep. [S. C.] 389; *Reuter* v. *Stuckart*, 181 Ill. 529.)

The restriction agreement is a conveyance of an interest in land, and being more than thirty years old is to be treated as an ancient deed.

A certified copy of the agreement was, therefore, admissible in evidence. That the power of attorney actually existed may be inferred from the fact that in the conveyance to Zabriskie in 1853 John R. Murray, Jr., acknowledged that the land was subject to the agreement.

But even if this was not evidence of the existence of the power, it was an adoption of the agreement and a ratification of its execution on his behalf relating back to the date of the agreement and was as effectual as if original authority to execute the agreement had been given. (Herman Estop. [2d ed.] § 1081; *Bradley* v. *Walker*, 138 N. Y. 291, 298.)

The conveyance to Zabriskie and all subsequent conveyances of the land were made subject to the covenants and provisions of the restriction agreement.

The effect of these conveyances was to charge the property in the hands of all subsequent owners, including the defendant, and estop them from denying its validity.

"An owner may subject his lands to any servitude, and transmit them to others charged with the same; and one taking title to lands, with notice of any equity attached thereto, or any outstanding right or claim affecting the title or the use and enjoyment of the lands, takes subject to such equities, and such right or claim, and stands, in the place of his grantor, bound to do or forbear to do whatever he would have seen bound to do or forbear to do. Lord COTTEN-HAM uses this language: ' If an equity is attached to property by the

owner, no one purchasing, with notice of that equity, can stand in a different situation from the party from whom he purchased.' (*Tulk* v. *Moxhay,* 2 Phil. 774.)" (*Trustees* v. *Lynch,* 70 N. Y. 449.)

As to the middle road I find that it is of the width of about sixty-six feet; that its location with reference to the property of the defendant is correctly shown on the Bridges map; that its easterly line intersected the northerly line of Thirty-fourth street at a point seventy-nine feet eleven inches easterly from the corner formed by the intersection of the northerly line of Thirty-fourth street with the easterly line of Madison avenue and intersected the north line of the defendant's property at a point sixty-five feet six inches east of the easterly line of Madison avenue measured along the dividing line between the defendant's property and the property of Mrs. Goodhue.

This is not only the line shown on the Bridges map but is the easterly boundary line of the property conveyed by the city to Mary Murray by deed dated August 3, 1847, and harmonizes with the conveyance by the city to William B. Astor of the westerly half of the middle road by deed dated September 17, 1847, and is shown on the diagram attached to said deeds as the easterly line of the road.

It is also consistent with the conveyances by the city to Gilbert C. Willett by deed dated February 25, 1799, and the conveyance to John Thomson by deed dated March 16, 1799, and the surveys and diagrams attached to such deeds.

These last named deeds refer to a map of the common lands of the city filed in the clerk's office of the city and also to a particular survey annexed to the deeds.

The particular survey attached to the deed to Willett contained a note as follows: "Surveyed July 10th, 1795," and the survey attached to the deed to Thomson contained a similar note to the effect that it was surveyed August 25, 1794, each of which is signed "Casimir Th. Goerck, City Surveyor."'

While the map filed in the city clerk's office has not been produced by either party, it must be presumed that the particular survey attached to the deeds is a copy of the larger map of the common lands of the city so far as it relates to the property conveyed.

It appears that as early as February, 1784, Mr. Goerck, the city

surveyor, presented to the common council of the city a map of the common lands divided into lots. Upon said map what is called the center road was shown as 66 feet wide, but by a resolution of the common council was made 100 feet wide, and with that change the map was approved and a part of the lots ordered to be sold.

On the map introduced in evidence by the defendant called the Goerck map the middle road, which I assume is the same as the center road, is stated to be 100 feet in width.

There is no proof, however, that this map was ever filed in the clerk's office of the city, or that such a map, if ever filed, showed the middle road to be 100 feet in width.

I attach very little weight to the maps introduced in evidence by the defendant by which it is claimed that the middle road was 100 feet wide.

The Goerck map, which is the foundation of all the others, is not shown to have been the map of the common lands referred to in the deeds to Willett and Thomson and it is produced not from the clerk's office but from the comptroller's office of the city. It bears date March 1, 1796, which was nearly seven years after Willett purchased his property at auction and a year later than the date of the particular surveys attached to the Willett and Thomson deeds.

Willett purchased his lots at a sale had in June, 1789, and in reference to such sale the resolution of the common council provided that a map of the lands to be sold should be exhibited at the Coffee house for ten days before sale for the examination of persons who might incline to become purchasers. Obviously a map dated in 1796 is not a copy of the map used at that sale. I must presume that the particular survey attached to the deed to Willett is a copy not of the map of 1796 but of the map exhibited at the Coffee house in June, 1789.

The sale to Willett was reported to the common council by the committee having it in charge at a meeting held on June 24, 1789, together with " the articles to be executed by the corporation and the said purchasers agreeable to the order of this board of the 3rd of April last."

This report was ratified by the common council on the date named. It thus appears that the sale to Willett was complete years before the date on the Goerck map produced by the defendant.

But if the defendant's testimony raises a doubt as to the width of the middle road, the question is settled beyond dispute by the subsequent action of the parties.

The property on both sides of the middle road was occupied by the grantees of the city. It is quite plain from the maps put in evidence by the defendant and from the testimony of Mr. Nostrand that if the middle road was ever laid out and opened to the width of 100 feet, such width was not maintained. The road was encroached upon on both sides; and on the Randel map of 1820 and the Ludlam map of 1822 it is designated as about 66 feet in width.

Such was the condition of the road when Madison avenue was opened and the middle road was discontinued and conveyances were made by the city to Mary Murray of the easterly half and to William B. Astor of the westerly half thereof.

In these conveyances the center line of the road was definitely fixed as being forty-six feet nine and one-half inches easterly from the corner formed by the intersection of the easterly side of Madison avenue with the northerly side of Thirty-fourth street, and the easterly side of the middle road where it intersected the northerly side of Thirty-fourth street was definitely located at a point thirty-three feet one and one-half inches easterly of the center line.

The titles of all subsequent purchasers rest upon these conveyances, and for upwards of sixty years no one has questioned their validity. While there may be some doubt as to what the width of the middle road was as originally laid out, or what the city intended, there is none as to the intention or legal effects of the acts of the parties interested in the later conveyances.

The city intended to divest itself of all title to the middle road and to vest it in the adjacent owners. Unless it did this by the conveyances to Mary Murray and William B. Astor the titles to the land on the easterly side of Madison avenue between Thirty-fourth and Thirty-fifth streets are defective.

In my opinion there was by the acts and conveyances referred to a practical location by the parties interested in the easterly and westerly lines of the middle road, and necessarily of the westerly line of the land conveyed by the city to Willett in 1799. (*Baldwin* v. *Brown,* 16 N. Y. 359; *Sherman* v. *Kane,* 86 id. 57; *Blackman* v. *Riley,* 138 id. 318.)

This practical location and settlement of the boundary line is conclusive upon the defendant and estops her from maintaining anything to the contrary. (*Hennessy* v. *Murdock*, 137 N. Y. 317.)

It follows from these views that unless the legal effect of the conveyance of Mary Murray to John R. Murray dated November 11, 1851, was to extend the restriction to the center line of the middle road, the part of the defendant's property subject to the restriction created by the agreement of February 22, 1847, is a lot in the rear of her property twenty feet one inch in width on Thirty-fourth street and thirty-four feet six inches in width on the dividing line between the property of the defendant and the property of Mrs. Goodhue.

The counsel for Mr. Morgan and his associate plaintiffs earnestly contend that the conveyance from Mary Murray to John R. Murray, Jr., in 1851 carried the restriction to the center line of the middle road.

It is argued that the parties to the partition action intended that lot 53 on the Bridges map, which is the easterly half of the middle road between Thirty-fourth and Thirty-fifth streets, should be allotted to the owner of lot 54; and as Mary Murray subsequently acquired title to lot 53 from the city by the application of the doctrine of estoppel it became subject to the restriction agreement.

The rule is well settled that if a person purports to convey lands to which he has no title, his deed operates by way of estoppel, if he subsequently acquire title to the land purported to be conveyed.

This rule, however, is not applicable to the present case. The restriction agreement does not purport to be made applicable to lot 53. It recites that the parties are " owners in fee simple " of divers lots and parcels of ground laid down on the Bridges map; and it provides that they will not " erect or cause to be erected on any of the lots or lot owned by them respectively or any part of the same any building or erection other than brick or stone dwelling houses," etc., etc.

None of the parties owned lot 53 in fee simple on February 22, 1847, and by the express terms of the agreement it was not made applicable thereto.

It cannot be said, therefore, that the parties intended that the agreement should apply to lot 53. Neither do I think it can be

said that the parties to the partition action intended that lot 53 should be a part of the land partitioned, nor do I find any evidence that they claimed title thereto.

Lot 53 was not allotted by the commissioners in the partition action to any one. This allotment was made in 1841, and it was not until April, 1846, that the quitclaim deed of lot 53 was executed and delivered to Mary Murray by the other heirs of John Murray in which it was recited that it was intended and supposed that the portion of the post road and the middle road had passed to the allottees of the adjoining lands. There is no recitation in that deed that the parties to the partition suit had title to the land within the road lines or claimed title thereto.

The restriction agreement was executed more than ten months after the execution of the deed referred to, and if it was intended to be applicable to lot 53 some more appropriate language was necessary to accomplish that result than that used.

It could not at that time be said that Mary Murray was the owner of lot 53 " in fee simple," nor is there any indication that the parties thought so. The language of the agreement precludes the idea that it was intended to apply to lot 53, and, therefore, there is no basis upon which the rule of estoppel can be applied.

None of the cases cited by the learned counsel are applicable to the facts of this case.

In *Lewis* v. *Gollner* (129 N. Y. 227) the defendant agreed not to construct or erect any flats " in plaintiff's immediate neighborhood." Of this agreement the court said : " The phrase ' immediate neighborhood,' taken in connection with the subject-matter of the contract, is not so indefinite as to be incapable of just and natural boundaries, but, in any event, covers and includes the locality of the construction in progress."

It was this contract that the court held attached to the land when the defendant bought it, and that it was not essential that the obligation and ownership should be simultaneous to make the contract effective.

Precisely the same rule was applied in *National Bank at Dover* v. *Segur* (39 N. J. L. 173).

If Mary Murray had claimed to be the owner in fee simple of lot 53 when she executed the restriction agreement, or if that agree-

ment had by its terms applied to lot 53, there would be ground for the application of the rule which the learned counsel invokes, but as neither of these facts exists, the point cannot be sustained.

I, therefore, find that the part of the defendant's property which is subject to the restriction is a lot in the rear thereof twenty feet one inch wide on Thirty-fourth street and thirty-four feet six inches wide on the north line of the defendant's property; and such being the fact the question is presented whether a court of equity should issue its injunction as prayed for in the complaint or whether equitable relief should be denied and the parties left to their legal remedy.

In my opinion an injunction should not be granted. This case is distinguished from all the reported cases in the most important fact that the greater part of the property upon which the defendant is erecting the building is not subjected to the restriction. Only a little in excess of one-quarter of the area of the lot is subject to the restriction. Upon the balance of the property the defendant is entirely free to erect precisely the kind of building which has been erected over the whole property, and to permit it to be used for any lawful businesses except those specially mentioned in the restriction agreement.

Assuming that Mrs. Goodhue desires to continue her residence upon her property, it is quite plain to me that she would suffer precisely the same annoyance and disturbance and inconvenience from the erection and occupation of a business building on that part of the defendant's lot which is free from the restriction as she would if such a building is extended over the whole lot. And if a business building would affect the value of her property in any way, the effect would be the same whether the building is extended over the whole lot or confined to that part which is free from the restriction.

The defendant's legal right is to construct a building for business purposes which shall be seventy-nine feet eleven inches on Thirty-fourth street and sixty-five feet six inches deep adjoining Mrs. Goodhue's property; and for any inconvenience or discomfort that Mrs. Goodhue will suffer from such a building or from its use or for any loss arising from a depreciation in the value of her property which may be caused thereby, she has no legal cause of complaint. The extension of such a building over the balance of the defend-

ant's lot as is being done will not, in my judgment, add to the plaintiff's annoyance or discomfort or damage in the slightest degree.

An injunction, therefore, would be of no benefit to Mrs. Goodhue, and for a like reason it would not benefit the plaintiffs in the Morgan case.

It would, however, cause the defendant a serious loss. Up to the time when the electric road was constructed through Thirty-fourth street that street was lined on both sides with private residences of the highest character. From the time of the construction of the electric road, however, until the present the character of the street has gradually changed, and it is now conceded by the plaintiffs that west of Madison and east of Lexington avenue, in other words outside of the restricted territory, it has become a purely business street

Between Madison and Lexington avenues the buildings have maintained in their external appearance the character of private residences. But many of the old residents have moved away, and a considerable part of the property is used for business purposes. Many persons who own residences in that part of Thirty-fourth street and continue to live in them are desirous of moving away and of selling their property for business purposes.

Thirty-fourth street has become a business thoroughfare within the restricted territory. It is not now a desirable place in which to live, and the property there is more valuable for business than for residential purposes, and will produce a much larger rental if used for business than if used for residences.

Madison avenue, between Thirty-fourth and Thirty-fifth streets, has also become an undesirable place to live. Altman's large store occupies the block on the east side of Fifth avenue, between Thirty-fourth and Thirty-fifth streets, and extends east on Thirty-fifth street to a point 100 feet west of Madison avenue. The delivery wagons from that store use Madison avenue to a considerable extent as a place to stand during a considerable portion of each day and cause considerable disturbance and discomfort to the residents in the block referred to.

It is quite plain, I think, that the defendant cannot make a profitable use of her property on Thirty-fourth street by devoting it to a residence. If she should now erect on the lot subject to the restriction a residence of the character intended by those who made

that agreement it could not be rented except for a sum which would be an inadequate return upon the value of the property and not at all to a tenant of the financial ability or social standing of the majority of those who reside elsewhere on the restricted territory.

An injunction would, therefore, cause the defendant a serious pecuniary loss, and prevent her from getting an adequate return from her property. An injunction, therefore, would be of no benefit to the plaintiffs and would impose great hardship on the defendant, and for these reasons an injunction should be denied.

If the restriction covered the whole or the greater part of the defendant's property I should reach a different conclusion.

The encroachments of business in the surrounding territory would not be a sufficient reason for refusing to specifically enforce the agreement.

The parties to the agreement must be presumed to have anticipated that that part of the city surrounding the restricted territory would ultimately be given up to business, although the time when that would happen may have seemed very remote in 1847. But it was plainly their intention to secure the restricted territory from the disturbance which business would necessarily produce when the city did grow up to the restricted territory.

Obviously those who owned property on the outskirts of the restricted territory would not enjoy the benefits of such an agreement to so full an extent as those who reside farther from the outskirts, but that fact would afford no legal excuse for the violation of the agreement.

In *Trustees of Columbia College* v. *Thacher* (87 N. Y. 311, 319) Judge DANFORTH said : " The general current of business affairs has reached and covered the entire premises fronting on Sixth avenue, both above and below the lot in question. If this was all, however, the plaintiffs would be justified in their claim, for it is apparent from the agreement that such encroachment was anticipated, and that the parties to it intended to secure the property in question from the disturbance which business would necessarily produce."

And in *Rowland* v. *Miller* (139 N. Y. 103) Judge EARL said : " Here the plaintiff has the right to occupy her house as a residence, and in such occupation to have the protection of the restriction agreement."

But when it is clear that an injunction will be of no benefit to the plaintiff and will be a hardship to the defendant, the rule is settled that an injunction will be denied.

In *Trustees of Columbia College* v. *Thacher* (at p. 317) the court said: "And so though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous, that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff."

And in *McClure* v. *Leaycraft* (183 N. Y. 36) Judge VANN (at p. 41) said: "A court of equity will not do an inequitable thing. It is not bound by the rigid rules of the common law, but is founded to do justice, when the courts of law, with their less plastic remedies, are unable to afford the exact relief which the facts require. Its fundamental principle, as its name implies, is equity. It withholds its remedies if the result would be unjust, but freely grants them to prevent injustice when the other courts are helpless. It cannot set aside a binding contract, but when the effect would be inequitable owing to facts arising after the date of the agreement and not within the contemplation of the parties at the time it was made, it refuses to enforce the contract and remands the party complaining to his remedy at law through the recovery of damages."

For the reasons I have stated I am of the opinion that plaintiffs will suffer the same disturbance, annoyance and discomfort, and their property would be affected in precisely the same way and to the same extent, from the erection by the defendant of a building which would be within the exercise of her legal rights as they will from the building complained of. An injunction would, therefore, not benefit them, and it would be a great hardship to the defendant in view of the changed character of Thirty-fourth street. Consequently equitable relief will be denied. The complaint in each case is dismissed, but, as the defendant is violating the agreement, the dismissal is without costs. It will also be without prejudice to the maintenance of an action at law for breach of the agreement.

INGRAHAM, P. J.:

We agree with the referee in his opinion and in the conclusion which has resulted in the dismissal of the complaint. The clear

intention of the parties to the instrument, to enforce which this action was brought, was to regulate the character of the buildings to be erected upon the premises and also to restrict the use to which any buildings thereon erected could be thereafter applied. Thus it was provided that there should not be erected on any of the lots owned by the parties respectively, or any part of same, any building or erection other than brick or stone dwelling houses of at least two stories in height, except churches and stables of brick or stone, for private dwellings. In addition to this general covenant providing for the nature of the buildings to be erected upon the property owned by the parties thereto, it was further agreed that the parties would not thereafter erect or permit upon such lots or any part of the same any of the occupations specified or any other use of the property known as nuisances in law. One was a covenant which applied to the character of the buildings to be erected on the property, the other a covenant which applied to the *erection or use* of a building erected upon the premises. It would seem that the latter covenant was not violated by the erection of the building that the defendant contemplated when the action was brought, but there was clearly an intended violation of the covenant restricting the nature of the building which should, therefore, be erected upon the premises subject to the covenant. (*Kitching* v. *Brown*, 180 N. Y. 414; *Clark* v. *Jammes*, 87 Hun, 215.)

When this agreement was executed the parties must have contemplated that the portions of the restricted area which abutted on other property not restricted would be affected by the erection of buildings or a use of the property of a character other than that to which the restricted property was confined, but notwithstanding this fact the restriction was absolute and as much affected property which adjoined unrestricted property as the other property within the restricted area. The fact that the use of the portions of the property adjoining unrestricted property would be affected by the use of such adjoining property would not justify the owners of the property restricted in violating the covenants which was to control all the property included within the area restricted. I am not prepared to assent to the proposition that the fact that a larger price could be obtained for the use of the property within the restricted area if the restriction was disregarded, or that

First Department, January, 1911. [Vol. 142.

the price for which such outlying property could be disposed of would be increased if the restriction was removed, is a justification for a breach of this covenant. If a use of any of the property covered by the restrictive agreement would be justified, it would be but a short time when the covenant as affecting the whole property could be safely violated. The parties who have purchased property within the restricted area subject to the restrictions contained in this instrument have acquired it subject to a restriction which insures its being maintained as residential property, and this a court of equity should enforce where it appears that in consequence of the proposed violation of the restrictive covenant the use of adjacent property for residential purposes is directly affected. The justification for the refusal to enforce this covenant in this action is that the referee has found and the evidence sustains the finding that the use of the rear of the plaintiff's lots does not at all affect the use of the plaintiff's property as a residence. Plaintiff's property is affected by the erection of the structure upon the portion of the defendant's property which is not restricted, but it seems clear that the fact that the defendant's building has been extended back to the rear of her lots could not at all affect the use of the plaintiff's property as a residence, while it would seriously injure the use by the defendant of her property to enjoin the use of the rear of her lots.

These facts appearing, I think a court of equity was justified in refusing to enforce the covenant, leaving the parties to an action at law if at any time it would appear that the violation of the covenant by the defendant on the rear of the lots did as a fact cause a serious injury to the plaintiff's property.

The other questions involved have been fully considered in the referee's opinion, which we adopt, and for the reasons stated by him the complaint was properly dismissed.

It follows that the judgment should be affirmed on the opinion of the referee, but, as both parties have appealed, without costs.

LAUGHLIN, MILLER and DOWLING, JJ., concurred.

McLAUGHLIN, J.:

I vote for affirmance on the opinion of the referee.