RALPH PULITZER and Another, Plaintiffs, *v.* GEORGINE CAMPBELL
and Others, Defendants.

Supreme Court, New York County, February 8, 1933.

*Jackson, Fuller, Nash & Brophy* [*John G. Jackson* and *Stephen P. Nash* of counsel], for the plaintiffs.

*Merrill, Rogers, Gifford & Woody* [*Charles L. Woody* and *Alexander R. Kellegrew* of counsel], for the defendants Bullard and others.

*Taylor, Blanc, Capron & Marsh,* for the defendants Blanc and others.

*Edward H. Blanc,* guardian *ad litem,* for Flora Blanc and others.

GAVEGAN, J.    This is a suit in regard to a restrictive covenant relating to land.    Its legal effect and meaning and its present enforcibility in equity are involved.

The plot referred to as plaintiffs' property is on the northerly side of East Seventy-third street, borough of Manhattan, city of New York.    Beginning 129 feet westerly of Madison avenue, it runs westerly along the street 120 feet, going back, in depth, 102 feet 2 inches to the center line of the block.    The easterly 66 feet on Seventy-third street came through a deed made by James Lenox to William Lalor, dated August 10, 1870, conveying the northwesterly corner of Seventy-third street and Madison avenue, facing 195 feet on the street and 102 feet 2 inches on the avenue. In that deed there is a covenant, referred to herein as the " covenant " or as the " entire covenant," reading as follows: "And the said party of the second part for himself, his heirs, executors, administrators and assigns doth covenant, promise and agree to and with the said party of the first part, his heirs and assigns, that he will not at any time hereafter erect, make, establish or carry on, or suffer to be erected, made, established or carried on in any manner on any part of the above described and hereby granted premises, any livery stable, railroad depot, slaughter house, tallow chandlery, steam engine, smith shop, forge, furnace, brass foundry, nail or other iron factory, or any manufactory for the making of glass, glue, vitriol, ink or turpentine or for the dressing, tanning, preparing or keeping of skins, hides or leather, or any theatre, opera house, brewery, distillery, molasses or sugar refinery, lager bier or concert saloon, or any manufactory, trade or business whatever which may be in any wise noxious or offensive to the neighboring inhabitants, but will use or suffer the said premises to be used for the erection of first class private residences only."

The words " but will use or suffer the said premises to be used for the erection of first class private residences only " have caused

the present controversy. It is to them that reference is made when the " restriction " is mentioned.

The suit is for a decree that the covenant is not legally a bar to the erection and maintenance of a first class modern apartment house or apartment hotel upon the easterly sixty-six feet of plaintiffs' frontage, and for a decree, on equitable grounds, that it may nòt be enforced.

The same covenant and the same deed were involved in *Korn* v. *Campbell* (192 N. Y. 490).

The westerly part of plaintiffs' plot, facing fifty-four feet on Seventy-third street, is restricted only as to nuisances.

Out of over one hundred parties defendant but thirteen raise an issue. They are referred to below as the " defendants." Their properties and the lands conveyed by the deed containing the covenant are in the same square block, the same " block " on the city's map.

They contend that the erection of anything but single family residences on plaintiffs' easterly sixty-six feet is inhibited by the restriction. On it, as stated below, two of the defendants have no standing. It does not run against the land of the other eleven. They are not restrained by it.

The bill alleges three causes of action and several narrow questions arise, especially as to the burden of proof and as to whether the complaint should be dismissed on technical grounds. These it will not be necessary to discuss inasmuch as plaintiffs have actually sustained the burden of proof and inasmuch as there have been litigated at length the real and fundamental issues. There are three questions:

1. Was the covenant intended to exclude modern high class apartment houses or apartment hotels?

2. Was it intended to be solely for the benefit of the grantor, " his heirs and assigns? "

3. Assuming that it was intended to inure to the benefit of the land of the grantor, to the advantage of successive owners of any part of same, however remote, has the neighborhood so changed that it would be oppressive and unconscionable to enforce it?

As the second count is most fundamental, it will be discussed first.

James Lenox inherited from his father a farm or tract now embracing the twelve city blocks bounded by Park and Fifth avenues, Sixty-eighth and Seventy-fourth streets. They remained almost entirely unimproved at the time of the grant to Lalor. Prior to that grant, commencing in 1860, Lenox had conveyed without the restriction the entire block immediately to the south of plaintiffs' property, five others further south and more than

half of the block on the easterly side of Madison avenue between Seventy-third and Seventy-fourth streets. When he transferred the corner to Lalor, Lenox retained all of the other property bounded by Seventy-third and Seventy-fourth streets, Fifth and Madison avenues, deeding away the same subsequently, however, without the limitation to " first class private residences." Free of the ban he also transferred to new owners, after August 10, 1870, two full blocks and about a third of another. Of all the conveyances by Lenox out of his tract, only the deed to Lalor contains the restriction against buildings other than " first class private residences." No such conveyance out of Lenox, excepting the one to Lalor, contained that language or any other language of similar import, or recited the covenant entered into between them or mentioned sales or conveyances by Lenox prior or subsequent to August 10, 1870.

The effect and meaning of the restriction must conform to the intention of the parties, Lenox and Lalor, " to be gathered, not merely from the language of the deed, but from all the surrounding circumstances." (*Booth* v. *Knipe*, 225 N. Y. 390, 396; *Korn* v. *Campbell, supra.*)

In construing a deed, to determine its operation and effect, the court should depend " less upon artificial rules than upon the application of good sense and sound equity to the object and spirit of the contract in the given case." (4 Kent Comm. *132, *133.)

The authorities refer to a covenant intended solely for the benefit of the grantor, his heirs and assigns, so that he or they may deal as desired in disposing of remaining lands, as " personal " to the grantor, thus distinguishing it from a covenant running with the land. " One who imposes a restriction upon buyers of his land may have in mind benefit to himself, or benefit to others." (*Bristol* v. *Woodward*, 251 N. Y. 275, 284, citing *Korn* v. *Campbell, supra; Nottingham Patent Brick Co.* v. *Butler*, 15 Q. B. D. 261; 4 Thompson Real Prop. § 3425.)

In *Korn* v. *Campbell* (*supra*) there was not involved and the court did not decide the question under consideration at this point.

In considering whether a restriction is " personal " to the grantor or whether it runs with the land, reference is frequently made to a statement in *Post* v. *Weil* (115 N. Y. 361, at p. 372), reading: " I think we all will agree that the presumption here, as in every other case, where a restriction is inserted in a deed against undesirable structures or trades, is that the insertion was for the purpose of protecting rights, which the grantor had in adjacent property."

This, when considered with other matter appearing on the same page and on the following page, 373, seems to refer to a covenant

" personal " to the grantor. It does not announce a presumption that the benefit of such a restriction is intended to run with the lands of the grantor, though to such effect it is frequently cited.

In the same opinion (p. 366) occurs the following: " but in this, as in every other case, our judgment should be guided by what was the probable intention; viewing the matter in the light of reason."

Here the indications are that Lenox and Lalor did not intend the restriction against " the erection " of buildings other than " first class private residences " to run with lands of Lenox. The outstanding considerations are:

1. Lack of map, plan or scheme of development, actual or implied.

2. Failure of Lenox to impose any bar of the same import by the conveyances which he made prior or subsequent to the grant to Lalor. By omitting the restriction from subsequent grants, Lenox showed the benefit to be personal to him, his heirs and assigns, so long as he or they retained any part of the tract. (*Rose* v. *Jasima Realty Corporation*, 218 App. Div. 646.) (See, also, *Obrock* v. *Crolly Company, Inc.*, 209 id. 624.)

3. Failure to mention the limitation in any other grant.

4. Absence of obligation on the part of the grantor to observe the restriction or to impose a similar limitation by other conveyances. This and other features mentioned show want of plan implied between the parties, want of design to improve according to a building scheme. It is unlikely that Lenox and Lalor intended to forever restrict the land conveyed to private residences on the understanding that a grantee, however remote in time, to any other part of the grantor's land, adjacent or across the street or far removed, though free to build as he pleased, could forever limit the development of Lalor's property. Such a one-sided agreement would not be left indefinite at a time when it was customary for conveyancers to load down deeds with verbiage.

5. Total lack of correspondence between obligations of grantor and grantee.

6. Absence of any convincing evidence that the restriction was part of Lalor's contract to purchase or that the defendants or their predecessors in title acquired their properties under circumstances showing that the restriction entered into the consideration of their purchases.

7. The utter futility of relying upon a limitation affecting Lalor's comparatively small plottage to safeguard any considerable part of the grantor's lands, or even nearby property on Seventy-third street or Madison avenue, against the erection of other than " first class private residences." The part of the tract taken by Lalor

is so trifling in comparative area that the agreement could not afford any protection to a distant owner in the Lenox farm. This discloses a purpose to save for Lenox, his heirs and assigns, a measure of personal control rather than an intention that the ban was to run with lands retained by him.

In the foregoing enumeration items 1, 2, 4 and 5 spell lack of mutuality, which is " a circumstance tending to the conclusion that the restriction was personal to the grantor." (4 Thompson Real Prop. § 3403.)

The position taken by the defendants in this case is not supported by any of the facts usually relied upon to show that a restriction runs with the grantor's lands. No plan, no course of conduct and no other circumstance favor them.

That Lalor covenanted with Lenox, " his heirs and assigns " indicates that Lenox took something for himself, his heirs and assigns; but thereby is not implied that the restriction ran with the land, that its benefit was not merely " personal " to Lenox, in the sense above stated. To ascertain what was given to him and his assigns we must seek the intention of the parties from the deed and from the surrounding circumstances. Were it otherwise, we would not find the Court of Appeals, in *Korn* v. *Campbell* (*supra*, at p. 497) saying: " In that event the question would arise whether the covenant was one purely personal to Lenox, and, if so, whether it would be enforceable at all, or whether it was made for the benefit of land retained by Lenox when he sold to Lalor, but afterwards conveyed to the plaintiff."

Perhaps, in such a covenant, " heirs and assigns " include none but heirs, devisees, personal representatives and those to whom the grantor expressly transfers the benefit, in conveyances of remaining lands.

Judgment will be rendered in plaintiffs' favor on the second cause of action.

The claim which is first set forth in the complaint is that the meaning of the entire covenant is not to exclude high class apartment houses or apartment hotels of the modern type.

They were unknown in 1870. But that is not controlling. As the courts have pointed out, parties agreeing to confine property to residences of a certain class contemplate that there will be in the future, as there have been in the past, radical developments in dwellings. (*Reformed Protestant Dutch Church* v. *Madison Avenue Building Company*, 214 N. Y. 268, 274, 275; *Pierson* v. *Rellstab Bros., Inc.*, 219 App. Div. 552; 246 N. Y. 608.)

Referring to many leading cases, counsel for plaintiffs contend that in situations of the kind the controlling word has been " one "

or " single," in expressions such as " one family," " single family," " one dwelling " and the like, and not the word " private " which, they assert, does not indicate the number of occupants but rather imports " non-public." They refer also to observations of the court in *Smith* v. *Scoville* (205 App. Div. 112) and to judicial expression to the effect that, where the intention is to exclude buildings for the use of more than one family, the parties should express their meaning and should not rely upon the courts to interpolate it. (*Sonn* v. *Heilberg*, 38 App. Div. 515, 517.)

Counsel for the defendants call attention to opinions in several cases involving this subject, which discuss the effect of the word " private," particularly *Levy* v. *Schreyer* (27 App. Div. 282; 71 id. 616; modified, 177 N. Y. 293); *South Church* v. *Madison Ave. Building Co., Inc.* (163 App. Div. 359); *Kalb* v. *Mayer* (164 id. 577); *Dollard* v. *Whowell* (184 id. 403, 405; affd., 225 N. Y. 706).

While certain equipment, halls and other parts of apartment houses are used in common, plaintiffs insist that they are merely incidental to the primary purpose, the high class residential occupancy of modern apartment houses, in which every suite constitutes a private residence, as private, counsel argue, as if it were in a single family house. It is also said that dwellings superimposed one upon another are " private residences " as much as those arranged horizontally one alongside the other, often separated by mere party walls.

These arguments in relation to the meaning of what is herein referred to as the restriction it is not necessary to consider; for an examination of the entire covenant discloses that the restriction is but the culmination of a ban on objectionable business and that the purpose is, not to confine the land conveyed to single family houses, but to preserve a residential atmosphere unmarred by certain named objectionable business uses or by any " noxious " " manufactory, trade or business." The defendants contend that the limitation to " private residences " calls for " one private dwelling per lot," though there is no express reference to " single family residences." Were the purpose to exclude everything but dwellings for one family we should not find specifically mentioned livery stables, slaughter houses, breweries and some twenty other objectionable buildings. To adopt the defendants' interpretation we should have to disregard half of the entire covenant.

They also mention what they call " public characteristics " of apartment hotels: common equipment and ways, above mentioned, quarters for doctors, musicians, valets, restaurants, quasi-shops, and even garages. But as Lenox and Lalor stated the kind of business to be barred, it is excluded, so far as they intended their

covenant to have effect. A prohibited business would be excluded whether or not it might be appurtenant to an apartment hotel.

For the most part the arguments in support of and against plaintiffs' first claim were presented to another Special Term of this court and to the Appellate Division which affirmed an order denying their motion for judgment on the pleadings as to their first cause of action. The denial of the motion was due to the ambiguity latent in first permitting business not specifically forbidden and then forbidding the erection of everything but " first class private residences." Though the justice sitting at the Special Term seemed to agree with the defendants' view that ordinarily a limitation to " first class private residences " excludes all but " dwellings for single families," his reason for denying plaintiffs' application was that the meaning of the entire covenant could not be determined without a consideration of surrounding circumstances, of facts which the pleadings did not disclose.

On the evidence which has since been presented the ambiguity should be resolved in plaintiffs' favor.

They will be sustained on the count they set forth first in their complaint.

When the defendants come to plaintiffs' third claim, that it would be oppressive and unconscionable to enforce the restriction against them, they must admit that there has occurred an extensive, radical and permanent change in the neighborhood.

In 1870 the Lenox tract was practically vacant, unimproved. Eventually it was built up with single family houses. A great number of these dwellings on Madison avenue, beginning at least a quarter of a century ago ( *Korn* v. *Campbell, supra*), were changed to provide for stores on the ground floors. In some instances flats were arranged above the stores. Throughout the section many of the buildings first constructed were converted into dwellings for several families or were turned over to keepers of rooming houses. Of this there are several examples in Seventy-third street and on the southerly side of Seventy-fourth street between Madison and Fifth avenues. Park avenue, for the most part, was improved with apartment houses and apartment hotels which were also erected at many locations on nearly all the side streets of the neighborhood, whether of sixty feet or of one hundred feet in width. There still remain on Fifth avenue and elsewhere in this vicinity a great number of single family residences; but as the result of changes in zoning, about 1925, the Fifth avenue frontage came to be regarded as destined for tall multi-family improvements.

It being futile to assert that the character of the neighborhood has not changed radically, the defendants are driven into a novel contention: that there has been no such change in what they refer

to as the "centers of the blocks" between Madison and Fifth avenues. In order that some meaning for this term, "center of the block," may be arrived at, it will be assumed that the Madison avenue and Fifth avenue corners, when used for apartments, will extend back but 100 feet into the side streets, though builders regard the avenue plottage as extending into these streets to the extent of 150 feet. This is on account of zoning provisions permitting avenue building heights to be carried back a distance of 150 feet. On the other hand, several of the corners in the vicinity seem not to be presently available as sites for improvement.

In this part of the city the distance between the westerly building line on Madison avenue and the building line on Fifth avenue is 420 feet, so that if we were to exclude corner plottage to a depth of 150 feet from Madison and Fifth avenues the centers of the blocks would have an extent of but 120 feet. Assuming, however, that, on the average, apartment houses facing the avenues will run back into the streets to a maximum of 100 feet, the centers of the blocks would have a frontage of 220 feet on either side of every street.

The property map shows that on the southerly side of Seventy-third street apartment house properties extend 140 feet easterly into Seventy-third street from Fifth avenue, thus reducing the 220 feet so-called center section to 180 feet. On the other hand, the northerly corner of Seventy-third street and Fifth avenue has not been improved with a multi-family dwelling, though on the south-easterly corner of Seventy-fourth street and Fifth avenue there is such a building running 125 feet $2\frac{1}{2}$ inches from Fifth avenue into Seventy-fourth street. In addition, the center sections of the blocks between Seventy-second and Seventy-fourth streets are covered in part with old-fashioned houses which are used as lodging houses or stand vacant and which have no prospect of again being used as dwellings for one family only. This applies to several buildings on the southerly side of Seventy-fourth street, more than 100 feet west of Madison avenue, not to mention the westerly 54 feet of plaintiffs' Seventy-third street frontage. The entire block front between Seventy-second and Seventy-third streets on Fifth avenue is improved with multi-family properties, one extending 172 feet into Seventy-second street. Moreover, on that street, which has a width of 100 feet, great heights are allowed to apartment houses and hotels.

These references to present conditions hardly bear out the assertion that changes in the neighborhood have left extensive, unbroken sections of single-family residences in the centers of the blocks.

From the record it appears that some of the defendants who rebuilt or remodeled residences, at very great expense, within the past decade, relied upon special agreements with adjacent owners

rather than on the provisions of the deed to Lalor. They could not in reason have so relied upon that deed which, including but a very small part of the Lenox farm, left so much unrestricted.

Again, while the defendants would read Lalor's deed as limiting the property conveyed to comparatively low buildings, thus assuring light and air, it is a fact that on part of plaintiffs' property there is a residence for a single family having a height of 102 feet. It is higher than a ten-story apartment house might be. Had it been built up another twenty feet or so, it would be as high as permissible to multi-family buildings under the zoning regulations. The restriction, even if it ran with the land, would not secure light and air to the defendants. (See, also, *Winston* v. *524 West End Avenue, Inc.*, 233 App. Div. 5.)

The defendants also find in Lalor's deed a right to privacy which, as they assert, would be violated by a multi-family dwelling. But on equal areas as many families might be provided for in a row of narrow single-family residences as in a two- or three-family house of a more commodious type.

The same may be said to the assertion that the limitation is a protection against excessive traffic and noise. So far as traffic is concerned vehicles might be attracted to a particular street for various reasons. It might, for instance, be a convenient approach to a bridge or popular store or theatre center.

Without unduly straining its language, the restriction may not be construed as intended to assure privacy and freedom from traffic or noise other than such as may be assured by the entire covenant.

It is clear from the record that if plaintiffs could not, in a period of normal business conditions, use for a modern high class apartment house or hotel the part of their property which was formerly included in the Lalor plot, it would be worth comparatively little. The prospect under any conditions would be poor for the sale or rental of single-family dwellings. It is probable that from the present improvements on their land, dwellings for single families, plaintiffs could not collect rent sufficient in amount to pay the property taxes; and the erection of any other kind of single-family dwellings would but entail additional loss.

The enforcement of the alleged restriction could not restore the former character of the neighborhood. It would continue financial loss to those who have instituted this suit without corresponding benefit to the defendants. It would be oppressive and unconscionable.

For the reasons indicated plaintiffs must succeed on the third cause of action. Therefore, it is unnecessary to consider at length some further points made for them in support of it; but these points will be referred to briefly.

On the unrestricted westerly part of their property, plaintiffs have the unquestioned right to erect an apartment house or apartment hotel to any height allowed by law; and owners to the west would be damaged substantially no more by a multi-family building covering plaintiffs' entire plottage than by one on their westerly fifty-four feet. Therefore, they refer to *Goodhue* v. *Cameron* (142 App. Div. 470). That case would be decisive in their favor were they opposed by no owner of property situated on East Seventy-third street or on East Seventy-fourth street, further to the east than plaintiffs' property. Accordingly, they seek to eliminate the defendants whose houses are located more easterly than plaintiffs' premises. Those defendants are eight in number. Two of them must fail because their titles come through the deed in which the restriction originated (*Korn* v. *Campbell, supra*). The other six did not succeed to any part of the land conveyed by that deed. To all six, however, one Coburn is a predecessor in title. He assembled in his sole ownership the Lalor plot and adjacent property, some of which had also been owned by Lalor. Coburn's combined parcels took in the Lalor corner on Seventy-third street, extended from it northerly on Madison avenue to Seventy-fourth street, and on that street ran westerly 270 feet, going back in depth 102 feet 2 inches from the southerly side of Seventy-fourth street to the center line of the block.

There was no merger in Coburn of the grant of August 10, 1870, with all of the lands retained by Lenox when the grant was made. Nevertheless, Coburn could have barred every person claiming through him from enforcing the restriction against any part of his entire plottage. This he did not do expressly; but counsel for plaintiffs argue that the same effect resulted from what he did do, inasmuch as he parted with all his property without reimposing the restriction. Though some of his deeds are made subject to it, this does not have the effect of reimposing it. (*Morrill Realty Corporation* v. *Rayon Holding Corporation*, 254 N. Y. 268, 276.)

The argument made by plaintiffs in relation to the standing of the six defendants claiming title through Coburn, it is unnecessary to consider; for in any event the third cause of action must be disposed of in plaintiffs' favor.

It should be noted, however, that when in *Korn* v. *Campbell* (*supra*, at p. 497) "the tract" is mentioned, reference is to the Lalor corner, 195 feet by 102 feet, 2 inches. Though this is clear enough from the context, it is rendered certain by the subject-matter, the rights, between themselves, of persons holding parts of the Lalor land.

Plaintiffs are entitled to the decision on their third count. Proceed in accordance with the foregoing, on notice.