Samuel S. Tripp, Spec. Ref. Mr. Justice James J. Conroy,
presiding in Special Term, Part III of this court, made an order, dated June 2, 1964, upon the consent of the attorneys for the plaintiffs and for the defendant Pennscott Builders, Inc. (CPLR 4317, suhd. [a]) pursuant to which this action was referred to the undersigned to hear and determine.
The defendant Kew Gardens Corporation, organized in October, 1912 under the laws of the State of New York, was served with process through the Secretary of State but has defaulted in appearing and answering the complaint. In or about the year 1912 this corporation was the owner of a certain tract of land situated in the County of Queens, State of New York, shown upon a certain map entitled ‘ ‘ Richmond Hill and Kew Gardens, Long Island, Borough of Queens, City of New York, showing Property of the Estate of A. P. Man ”, and filed in the office of the Clerk of Queens County on November 29, 1911 as Map No. 616, the said tract of land being also shown on a certain map dated March, 1920, entitled “ Kew Gardens Northern Part of Richmond Hill 2nd Ward — Borough of Queens — New York City showing Part of the Holdings of the Kew Gardens Corporation and Adjoining Properties ”. Thereafter, the corporation subdivided its tract into building lots which it sold from time to time to various purchasers and conveyed the same by deeds identical in form containing the following restrictive covenants: “ And the party of the second part for its heirs and assigns does hereby covenant to and with the party of the first part [Kew Gardens Corporation] that neither the party of the second part nor its heirs or assigns shall or will without the consent by written instrument of the party of the first part at any time hereafter erect or permit upon any part of the land conveyed by the present indenture any slaughter house, smithshop forge furnace steam engine, brass foundry nail or other iron foundry or any manufactory of gunpowder, glue varnish vitriol ink or turpentine, or for the tanning, dressing or preparing of hides skins or leather or any ale house, brewery, distillery or other place for the manufacture or compounding of intoxicating liquors wine, beer ale or spirits or for selling or dispensing the same in any form or for carrying on any other noxious dangerous or offensive trade or business and that neither the party of the second part nor its heirs or assigns will erect *604 on sand premises or permit to b.e erected thereon, without the written consent of the party of the first part any sign or any fence wall or similar structure or any building intended for the occupation of more than one family or household or any building nearer than twenty feet or any barn stable or other outhouse, nearer than forty feet to the line of any street, road or park land out or which may be laid out upon the property embraced in said map or any barn, stable out-house or cesspool nearer than ten feet to any adjoining property of party of the first part; and further that the present covenants on the part of the party of the second part shall run with the land intended to be affected hereby and may be enforced by action injunction or otherwise.” (Italics supplied.)
Prior to 1953 the owners for the time being of the lots embraced in the area here involved, bounded by Park Lane South, Metropolitan Avenue, Church Street (118th Street) and 84th Avenue in what is now lmown as the Kew Gardens section of Queens County, New York, constructed on each of said lots one-family dwellings with 20-foot setbacks from the street lines, except insofar as the Kew Gardens Corporation, their common original grantor, modified the foregoing deed restrictions so as to allow setbacks of less than 20 feet from the adjoining street with respect to certain lots, the occupancy of certain existing dwellings by two-families and the commercial use of lots along Metropolitan Avenue. :
After the Kew Gardens Corporation completed its development and disposed of its only remaining parcel, formerly the Kew Gardens Inn, now occupied by a proprietary hospital on Queens Boulevard, it was duly dissolved on January 22, 1953 by a voluntary dissolution and engaged in no business thereafter except to release restrictions for a consideration as hereinafter described. It was stipulated that John M. Derwin, the president of the Kew Gardens Corporation, if called to the witness stand, would testify that in or about 1952 he and others purchased all of the stock of that corporation of which he thereupon became president; that at the time of such purchase it owned no real property other than that occupied by the Kew Gardens Hospital and certain unusable strips and gores throughout the tract which were subject to tax liens, had no value and were abandoned; that on October 31,1952 the corporation conveyed the hospital property to Juris Operating Corporation which, by deed dated November 25, 1952, conveyed it to John M. Derwin and others and they, in turn, by deed dated the same day, conveyed said hospital property to Kew Gardens Enterprises, a copartnership which thereafter owned and now *605 owns said property; and that after the dissolution on January 22, 1953 Kew Gardens Corporation “ owned no property, real or personal.”
The plaintiffs and the defendant Pennscott are the owners through mesne conveyances from the original common grantor, the Kew Gardens Corporation, containing the deed covenants and restrictions hereinbefore set forth, of lots upon which one-family dwellings had been erected substantially in accordance with such covenants and restrictions. Pennscott acquired its plot and the one-family dwelling erected thereon known as 116-02 Grosvenor Lane and located at the intersection of the easterly side of 116th Street (Audley Street) and the southerly side of Grosvenor Lane by deed dated May 6, 1963 and recorded on May 8, 1963.
Thereafter and on or about May 31, 1963 it entered into an agreement with the dissolved Kew Gardens Corporation which was recorded on June 14, 1963 whereby the latter purported to waive and release the restrictive covenants applicable to the Pennscott parcel in such a way as to permit the subdivision thereof into four lots and the construction of four attached dwellings thereon by reducing the setback on 116th Street to 10 feet and eliminating altogether the 20-foot setback on Grosvenor Lane as well as the side-yard restrictions. For the foregoing agreement Pennscott paid $1,000 to the Kew Gardens Corporation and $150 to its attorney for his legal services. It had paid $800 to the corporation and $200 to its attorney for lifting the restrictions covering its property on Curzon Road and Richmond Hill Drive (117th Street), a short distance south of its Grosvenor Lane property, upon which it has already erected five attached two-family houses, and an additional consideration for permission to hook up one of such houses with the existing sewer owned by that corporation.
The plaintiffs in this action seek (1) to declare null and void the agreement dated May 31, 1963 between the defendants, Kew Gardens Corporation and Pennscott, purporting to waive and release the restrictive covenants applicable to the latter’s parcel on Grosvenor Lane and 116th Street, Kew Gardens, Queens County, New York; (2) to restrain the construction on that parcel of any multi-family building, or any building, within 20 feet of the lot lines of Grosvenor Lane and of 116th Street and (3) to declare that the restrictive covenants herein-before described remain in full force and effect with respect to the Pennscott parcel and all other property in its immediate vicinity.
*606 ‘ ‘ A right reserved to release restrictions cannot be exercised after the reserver has conveyed all of his land and thus, used to ruin all of the property of others who have bought and improved their land on the faith of the restrictions.” (4 Warren’s Weed, New York Eeal Property [4th ed.], p. 734.) Accordingly, the provision in the deed restrictions here involved, reserving to Kew Gardens Corporation the right to waive such restrictions by written consent, could be exercised by it only so long as it retained part of the tract in its possession. (Rose v. Jasima Realty Corp., 218 App. Div. 646, 651; Ward v. McCarthy, 202 App. Div. 849, affd. 235 N. Y. 615, citing Gutting v. Eiermann, 165 App. Div. 916.)
In Gutting, the Second Department held that after the original grantor sold the entire tract which he had restricted, his interest in the covenants there involved ended and, consequently, his “ attempt to modify these covenants after he had disposed of the lots and became a stranger to the title was nugatory as to the other lot owners, who had purchased on the faith of these restrictions. Such a release would in effect destroy the value of the lots sold by authorizing a use of a part of the estate for a purpose inconsistent with the restriction by which * * * [he] had professed to bind the whole.”
In the case at bar the Kew Gardens Corporation, the common grantor, not only disposed of its sole remaining parcel after it had completed the development of its tract as shown on the filed maps, but it voluntarily dissolved on January 22, 1953 and has since owned no property, real or personal. Consequently, under the foregoing authorities, it no longer had the power to change or modify the covenants contained in its deeds. Besides, it can hardly be said that this corporate grantor, after it had been duly dissolved, had the capacity to sell waivers, destructive of the restrictions it had imposed in developing its original tract. That was not its normal business before dissolution in January, 1953 and surely it cannot be its sole business activity 10 years later, under the guise of winding up its affairs. (Business Corporation Law, §§ 1005, 1006, formerly Stock Corporation Law, § 105, subd. [8];, General Corporation Law, § 29.) It follows that the agreement dated May 31, 1963 by which the Kew Gardens Corporation purported to waive the restrictive covenants applicable to Pennscott’s newly acquired property is null and void.
Pennscott urges, however, that the plaintiffs may not enforce the restrictive covenants here involved since the common grantor reserved the right to waive them. It is indeed true, as pointed *607 out by Mr. Justice Pittoni in Goldberg v. Paul (14 Misc 2d 988), that “ there has developed a line of cases which decided that the reservation of such a right makes the covenant personal to the common grantor and therefore not available to his grantees.” After analyzing the cases cited by him at page 992, the learned Justice concluded at page 995 as follows: “ The correct rule appears to be that the reservation of a power in the common grantor to waive or vary conditions may be considered as a factor in determining as a matter of fact whether there was a general plan or scheme for uniform development in the particular case. If it appears that there was such a plan or scheme, and the consent of the common grantor has not been given to a modification of the restrictive covenant, a grantee may have remedy against another grantee to enforce the restrictive covenant. ’ ’
Since the purported modification by Kew Gardens Corporation dated May 31, 1963 of .the restrictions affecting the Pennscott parcel is null and void, the equitable right of the plaintiffs to seek the enforcement thereof depends upon whether the parcels sought to be charged with the restrictions were embraced in a general plan or. scheme for the uniform development of the tract for the benefit of the grantees. (Korn v. Campbell, 192 N. Y. 490.) While Korn defined covenants restricting the use of land into three broad classes, the court noted at page 498 of its opinion: “We do not mean to intimate that special circumstances may not exist in which a case not within the three classes above referred to may present considerations which would justify the enforcement of such a covenant in a court of equity. ’ ’ The question whether ‘ the owner of the land intended to be benefited had the right to enforce the covenant, even though he did not come within any one of the enumerated classes ” mentioned in the Korn case (supra), is “ one solely of intention ” (Zamiarski v. Kozial, 18 A D 2d 297, 301), “ to be gathered, not merely from the language of the deed, but from all the surrounding circumstances.” (Booth v. Knipe, 225 N. Y. 390, 396.)
The proof establishes that the common grantor, Kew Gardens Corporation, subdivided its large tract of land into building lots, as shown upon a filed sales map, with intent to market them; that these lots were sold from time to time to various purchasers and conveyed to them by deeds containing identical restrictive covenants and that prior to 1953, the owners for the time being of the lots so conveyed, constructed on each, in reliance upon the restrictive covenants, dwellings for one family only, set *608 back, with certain exceptions consented to by the common grantor, 20 feet from the street lines. Alrick H. Man, Jr., the president of Kew Gardens Corporation in 1934 and on its board of directors for three or four years prior thereto, is the son of Alrick Man, Sr., the original developer of the tract whose name appears on the filed map. He testified that only the numbered lots shown on that map were owned by the corporation; that the frontage on Metropolitan Avenue, on Lefferts Boulevard, on Union Turnpike and on Queens Boulevard was generally contemplated for business and apartment house use and that the rest of the area shown on the map was developed and maintained as private one-family residences.
The combination of all of the foregoing facts and circumstances establishes-that a scheme for uniform improvement was contemplated by the common grantor and made known to its grantees, for whose common benefit the identical restrictions in all deeds from the common grantor were intended with the right of each to enforce them against the others within the area of benefit. (Bristol v. Woodward, 251 N. Y. 275, 284; 4 Warren’s Weed, New York Real Property [4th ed.], pp. 723, 738.)
While the Kew Gardens Corporation .reserved the right to waive or modify the restrictions by written consent, it was held in Elliston v. Reacher ([1908] 2 Ch. 665), cited favorably in Booth v. Knipe (225 N. Y. 390, 397, supra), that a common grantor’s reservation of such a power is not fatal to the existence of a common plan or scheme of development. The English court noted that “.it is altogether exceptional not to see some power reserved to the vendor to abstract certain property from the scheme ” (p. 672) and that such power was “ one element to consider and assist the court in arriving at the conclusion of fact whether there was or was not a scheme, and nothing more than that ” (p. 674).
In describing the circumstances under which the Kew Gardens Corporation generally gave .written consents to.variances from the restrictions, Mr. Man testified that other than the streets that were intended for business or apartment house use, the mapped area was limited to one-family residences set back 20 feet from street lines ‘ ‘ except when the builders made an error here and there of a foot or two,” and that: “ Whenever we felt that the neighboring property owners were likely to be adversely affected, we went so far as to insist upon the person requesting a release to get consents from those property owners whom we felt might be adversely affected.” In Grengard Corp. v. Kew Gardens. Corp. (247 App. Div. 744, app. dsmd. 272 N. Y. 514), *609 which involved the identical covenants now under consideration, the court upheld the reserved power of Kew Gardens Corporation to modify them over the objections of neighboring property owners in connection with property on Grenfell Avenue and Lefferts Boulevard, even then a business thoroughfare close to the Kew Gardens Station of the Long Island Bail Boad upon which the Homestead Hotel now stands. While the appellate court found that the Grengard property was ‘ ‘ not adapted to improvement for purposes of one-family private residences ”, that setbacks of 20 feet on both street lines ‘ ‘ would make plaintiff’s property unsuitable for business ” and that “ It was not the purpose of Kew Gardens Corporation by the original restrictive covenants to restrict properties which it sold to one-family residences ’ ’, it left unreversed certain findings and conclusions of which the following are the most significant:
“ 1. That the covenants, conditions, agreements, restrictions and reservations in question were not imposed for the sole benefit of the original grantor, Kew Gardens Corporation.
* * *
“ 7. That the original grantor Kew Gardens Corporation established, by means of the restrictive covenants set forth in the deeds to these defendants, a uniform plan of development and that the various parcels in the development were sold with reference thereto.”
In light of all of the foregoing, the grantor’s reservation of the right to modify the restrictions was not inconsistent with its intention to establish a common scheme of development of its land for the benefit of the purchasers to whom the various lots shown on the filed sales map were, from time to time, conveyed by deeds containing identical covenants. When Pennscott purchased its lot and the one-family house thereon erected, it was bound to know and indeed conceded knowing of the identical restrictions in the deeds to other lots and each deed prior to its own, containing the same restrictions, created easements in its lot in favor of the other lots. (Chesebro v. Moers, 233 N. Y. 75, 80; Equitable Life Assur. Soc. v. Brennan, 148 N. Y. 661, 672; 4 Warren’s Weed, New York Beal Property [4th ed.], p. 812.) Accordingly, Pennscott may not, in violation of these restrictions erect a building on its property for the occupation of more than one family with no setback whatsoever on Grosvenor Lane and with only a 10-foot setback on 116th Street, unless, of course, the evidence warrants a finding that such a substantial change has occurred in the character of the neigh *610 borhood as to make it inequitable to' enforce the restrictive covenants.*
All streets in the area of Pennscott’s property are 60 feet wide except Grosvenor Lane which has a width of only 25 feet —15 feet from curb to curb. From the easterly side of 116th Street about 230 feet south of Metropolitan Avenue, it runs in a northeasterly direction to a point about 80 feet south of Metropolitan Avenue where it turns at an angle of approximately 68 degrees north to its terminus on that avenue where it is parallel with 116th Street. The westerly side of Grosvenor Lane at that point (lot 8 shown on map annexed to the complaint) is improved to a depth of 80 feet by a two and one-half story nearly completed brick apartment house, facing Metropolitan Avenue. A triangular parcel (shown on lot 12 on the map annexed to the complaint), on the easterly side of Grosvenor Lane and fronting on Metropolitan Avenue, is vacant up to almost its intersection with 118th (Church) Street. The westerly side of 118th Street until it crosses Curzon Road south of Metropolitan Avenue is improved by six apartment houses. That street is in an area which is unprotected by the covenants here involved, except for the southernmost apartment house on the westerly side of 118th Street which was erected on lot 101 shown on the map annexed to the complaint. This apartment house area is neither indicative of “ deterioration, nor persuasive that the covenants attacked have been rendered obsolete, and the restricted area [on 116th Street and Grosvenor Lane] undesirable for private residences ”. (Normus Realty Co. v. Disque, 20 A D 2d 277, 281; Cummins v. Colgate Props. Corp., 2 Misc 2d 301, 305, affd. 2 AD 2d 749.)
The three blocks on the westerly side of 116th Street south of Metropolitan Avenue to Curzon Place are improved by substantial one-family dwellings set back at least 20 feet from the street, except for the apartment house on the southerly side of Metropolitan Avenue which is outside the protected area and two semiattached one-family dwellings on 116th Street south of that apartment house which architecturally blend with the detached one-family dwellings in that block, their roofs having twin gables. The semiattached houses were built about 1926.
*611 On August 21, 1930 a declaratory judgment was rendered in this court (Rossum v. Kew Gardens Corp., Index No. 4037-1929) pursuant to which the restrictive covenants affecting the 153-foot frontage on the southerly side of Metropolitan Avenue between the easterly side of 116th Street and the westerly side of Grosvenor Lane (shown on lots 8 and 9 on the map annexed to the complaint) was to the depth of 80 feet south of Metropolitan Avenue declared unenforcible and inoperative, with the proviso that no stores be erected on that portion of the premises which fronts on 116th Street, except so much of any store which may be erected on the corner of Metropolitan Avenue as will extend on said 116th Street. The foregoing determination, dealing as it did with the heavily travelled business thoroughfare on Metropolitan Avenue, is not controlling. That, in effect, was the holding in Crocheron Props. v. Behr (1 A D 2d 835). In that case the restrictive covenants limiting certain property to one-family dwellings were sustained notwithstanding a decision in a prior action (Schultheis v. Wohlleb, 231 App. Div. 851), involving the same covenants but affecting another portion of property subject thereto, were held unenforcible because of a substantial change in the immediate neighborhood. Nor are the deed restrictions here involved rendered less effective because ever since the adoption in 1916 of the Zoning Resolution of the City of New York, property on the easterly side of 116th Street, excluding the frontage on Metropolitan Avenue, has been in the multifamily residential R 7-1 zone. (Neilson v. Hiral Realty Corp., 172 Misc. 408; Lefferts Manor Assn. v. Pass, 28 Misc 2d 1005; Rick v. West, 34 Misc 2d 1002.)
Pennseott’s property has a frontage of 77.20 feet on the easterly side of 116th Street and 82.29 feet on the southerly side of Grosvenor Lane. The one-family house erected thereon is set back at least 20 feet from both streets. Next to it is the one-family house of the plaintiff Richmond with a front setback of 24 feet. To the right of that house is the property owned by one Tobia, who is not a party to this action but his one-family house has a front setback of 20 feet. Across these three houses on the northerly side of Grosvenor Lane are 3 one-family houses owned by the plaintiffs Schonfeld, Messer and Levine. The entrance doors of the houses belonging to the Schonfelds and the Messers are set back 15 feet from the curb or 9 feet from the lot lines with about 3 feet more from the rest of the front walls inasmuch as the entranceways extend about 3 feet beyond such walls. The Levine corner house is set back on the northerly side of Grosvenor Lane from 12% to 35 feet at the corner of 116th Street and from that street it is set back 14 feet. These *612 three houses were built by one Harry Chemitz, who later, on August 30, 1927, obtained from the Kew Gardens Corporation a waiver of the 20-foot front and the 10-foot side and rear setback restrictions. To the north of the Levine property, on the easterly side of 116th Street, is a one-family house setback at least 20 feet from that street.
Personal inspection of the area upon the stipulation of counsel and the photographs in evidence reveal that Grosvenor Lane on which the six one-family houses above described are located is in the midst of a quiet tree-lined suburban residential area improved by fine, old one-family dwellings with well-kept lawns. South of Pennscott’s house on the easterly side of 116th Street, however, is a large one-family house setback approximately 40 feet which is occupied by the ‘ ‘ Kew Gardens Anshe Sholom Center,” a religious community house. This use does not violate the restrictive covenants here involved. (Bolhack v. Temple Anshe Sholom of Kew Gardens, 184 Misc. 1071.) In that case Mr. Justice Cortland A. Johnson held that the use as a synagogue by the defendant therein of one of the fine one-family dwellings in a high-class residential district, likewise protected by the instant restrictive covenants, cannot be restrained. South of the foregoing property is a six-story apartment house on the easterly side of 116th Street across the intersection of Mayfair Road with the westerly side of 116th Street. This building, which was erected on lots 1, 2, 3 and 4 shown on the map annexed to the complaint, was authorized by the written consent of the Kew Gardens Corporation dated September 10,1927. The apartment house located further south on the easterly side of 116th Street and shown as an unnumbered lot on the map annexed to the complaint, appears to have been erected on land that the Kew Gardens Corporation never owned. Both of these buildings are set back in excess of 20 feet from 116th Street.
Neither of these two apartment houses nor the location of some of the one-family houses and garages closer than 10 feet from their side and rear lot lines are such offensive violations as to change the essential character of the area in the immediate vicinity of Pennscott’s property so as to render it undesirable for continued private residence use. Despite the discordant note created by the deviations from the pattern of development designed by the restrictions, more specifically the two apartment houses on 116th Street, the area immediately surrounding Pennscott’s property still retains its basic character in harmony with the restrictions. The dominant impression upon the viewer is that of a neighborhood of private uncrowded detached dwell *613 ings with ample setbacks and yards. The original character of the neighborhood has not yet been destroyed.
Pennscott acquired its property with full knowledge of the restrictions and consequently any hardship it may suffer if not permitted to build a multifamily structure, with no setback whatsoever on Grosvenor Lane, is self-created. No doubt the lifting of the restrictions would be to Pennscott’s financial advantage but that would also result in a disproportionate hardship and damage to the plaintiffs and their one-family homes to which the covenant appertains. (Congregation Khal Chasidim of Brooklyn v. Congregation Beth El of Borough Park, 19 A D 2d 622.)
The contention in Pennscott’s brief that “Primarily, each and every plaintiff would benefit from the lifting of the restrictive covenant ’ ’ inasmuch as 1 ‘ then the value of the properties would be enhanced; in that they could then be sold to other builders, similar to defendant, who would be willing to pay a higher price for the property ”, is not a consideration that appeals to a court of equity. Each plaintiff “Rightly or wrongly * * * believes that the comfort of his dwelling will be imperiled by the change, and so he chooses to abide by the covenant as framed. The choice is for him only. * # # He will be protected in his refusal by all the power of the law. ’ ’ (Evangelical Lutheran Church v. Sahlem, 254 N. Y. 161, 168.) Judgment, as prayed for in the complaint, is accordingly granted in favor of the plaintiffs.

 Although Pennseott did not affirmatively plead that it would he inequitable to enforce the restrictive covenants here involved because of change in the character of the neighborhood, that issue was broadly tendered by the complaint and was litigated after counsel for the plaintiffs stated on the record: “We contend in addition to, of course, the invalidity of the release, that there has been no change in this particular neighborhood which would render the enforcement of these covenants inequitable.”