JOHN I. D. BRISTOL, Appellant and Respondent, *v.* KENNETH N. WOODWARD et al., Respondents and Appellants, Impleaded with Others.

(Argued May 29, 1929; decided July 11, 1929.)

*Edwin F. Valentine* for plaintiff, appellant and respondent. The property owned by the plaintiff in Greeley

Park is not subject to any uniform plan restricting the sale thereof in plots of any particular size, and the finding of the Appellate Division that said property is subject to a restriction limiting its sale to plots of not less than one-half acre is erroneous. (*Equitable Life Assurance Society* v. *Brennan,* 148 N. Y. 661; *Landsberg* v. *Rosenwasser,* 124 App. Div. 559; *Gebhardt* v. *Addison,* 87 App. Div. 375; *Korn* v. *Campbell,* 192 N. Y. 490; *Beach* v. *Jenkins,* 174 App. Div. 813; *Davidson* v. *Dunham,* 159 App. Div. 207.)

*Ralph M. Arkush* for defendants, respondents and appellants. The law of the case was correctly decided by the Appellate Division. (*Vogler* v. *Alwyn Improvement Corp.,* 247 N. Y. 131; *Chesebro* v. *Moers,* 233 N. Y. 75; *Tallmadge* v. *East River Bank,* 26 N. Y. 105; *Bimson* v. *Bultman,* 3 App. Div. 198; *Turner* v. *Howard,* 10 App. Div. 555; *Nissen* v. *McCafferty,* 202 App. Div. 528; Weed's Practical Real Estate Law [2d ed.], 910; *La Place* v. *Ruehl,* 206 App. Div. 761; *Beach* v. *Jenkins,* 174 App. Div. 813.) The undisputed evidence conclusively establishes that the plaintiff changed the uniform plan of development from half-acres to acres at the time of the conveyance to the company. (*Trustees, etc.,* v. *Smith,* 118 N. Y. 634.)

CARDOZO, Ch. J. The action is one for a declaratory judgment.

Plaintiff in 1920 was the owner of a tract of 400 acres in or near the village of Chappaqua, Westchester county. He laid out the tract into fourteen " parks " or subdivisions, of which one, known as Greeley Park, includes the land in suit. His first sale was made in April, 1924. He then conveyed to one Farnham a parcel of approximately five acres described as lot number 1 on a map entitled " Greeley Park Subdivision of Greeley Hills." This map was referred to in the deed as one about to be filed in the office of the Register, and the filing was soon

thereafter. Fifteen numbered lots are indicated on the map, and one unnumbered lot marked " Lake Reservation." They vary greatly in size. Lot number 1, as we have seen, was five acres. The others range irregularly from a maximum of about an acre and a third to a minimum of about two-thirds of an acre. Within these limits there is no uniformity either of area or of shape.

The deed to Farnham must be stated in some detail, for it is at the root of the dispute. The premises are conveyed subject to " covenants and restrictions hereinafter imposed on said grantee, her heirs and assigns," which the grantee " covenants for herself, her heirs, executors, administrators and assigns shall be as follows," the numerals being inserted in the summary for convenience of reference: (1) a covenant not to suffer any manufactory, business industries or stores upon the premises, but to use them for residential purposes only; (2) a covenant not to suffer any saloon, restaurant, hotel, boarding house or tenement house, with a repetition of the statement that the use shall be residential; (3) a covenant not at any time to sell or subdivide the premises in lots or plots having a less area than one-half acre; (4) a covenant not to allow upon any plot any building whatever (aside from the usual stable or garage appurtenant to dwellings) except one dwelling house to be used for one family only, to cost not less than $12,000, the style of architecture to be approved by the grantor or in case of his death by his personal representative; (5) a covenant that any dwelling house or outbuildings shall be placed at stated distances from the exterior lines of the lot; (6) a covenant that the resale price of any portion of the premises separately resold shall not be less than at the rate of $3,500 per acre, and that the proceeds will be applied on any mortgage held by the grantor or his assigns; (7) a covenant that the roads shown on the filed map shall be kept open for the common use of all residents of the property abutting thereon,

repairs thereto to be made by the grantors, but the lot owners to contribute to the cost in proportion to their acreage; (8) a covenant as to cesspools; and (9) a covenant that " the aforesaid covenants are to run with the land until the year 1940."

None of the covenants thus summarized (except covenant number 7) is expressly declared to be binding on the grantors, Bristol and wife, the parties of the first part. Immediately following covenant number 2, there is, however, a clause of reservation on the part of the grantors which amounts by implication to a reciprocal covenant on their part as to some at least of the obligations assumed by the grantee. By this clause, " the parties of the first part reserve the right, however, should they so desire, to erect upon any portion of their own property remaining unsold a lodge, apartment house, water supply system, lecture hall or public building, and the erection, rental or disposal of such shall not be deemed by either party as a violation of the covenants and restrictions herein contained, or as a waiver of the rights of either party thereunder."

In June, 1925, plaintiff conveyed to the defendant Woodward the lot on the Greeley Park map described as the Lake Reservation and also lot number 15 and the westerly portion of lots numbers 13 and 14. The deed contained covenants and restrictions substantially the same as those in the deed of lot number 1 to Farnham, except that the restriction as to sale or subdivision specified one acre, and not one-half acre, as the minimum area of subdivision. The defendant Woodward testified that parol representations were made to him to the effect that the same restriction as to acreage applied to all other lots in Greeley Park, but this was contradicted, and the trial judge refused to find in accordance with his testimony. On the contrary, the finding is that no representations were made at any time.

Some months later, about February 1, 1926, the defend-

ant Woodward made an oral agreement with the plaintiff for the purchase of other portions of lots 12, 13 and 14, about one and a quarter acres, adjoining the land conveyed the year before. The restrictions were the same, including the one-acre limit in the event of subdivision. The deed of this additional land, dated March 1, 1926, was taken in the name of the 1181 Second Avenue Corporation, which Woodward owned and managed.

After the sale to Woodward, but before the sale to the corporation, plaintiff prepared two pamphlets describing the development at Chappaqua, not only at Greeley Park, but at all the other parks, six in number. Included in the pamphlets were photographs of Woodward's house then in course of construction. There is testimony that a copy was given to Woodward, though the date is left indefinite. " I think it was given to me," he says, " after I had moved in my house. I should imagine around February, 1926." The language of the pamphlets is rhetorical and lacking in precision, yet the fair inference to be drawn from it is that all the Chappaqua parks are to be sold in acre or half-acre lots, a half-acre to be the minimum. There is no direct evidence that Woodward read the pamphlets before buying the additional acreage for the defendant corporation, or that he was influenced thereby. On the contrary, there is an allegation in the answer that the purchase was made in reliance upon representations made in March, 1925, before the pamphlets had been written.

Following the sales to Woodward and to the defendant corporation, the plaintiff made a sale to the defendants Merritt of portions of adjoining lots, numbers 12 and 11. The deed to the Merritts followed the same form as those to Woodward and the corporation, except that it provided that the minimum area of subdivision should be only a quarter of an acre.

Upon threats by the defendants Merritt to subdivide the land accordingly, the defendant Woodward gave

notice of protest and resistance. He also gave notice to the plaintiff that the one-acre restriction was applicable to the whole of Greeley Park, and that the sale of any smaller lots would be challenged in the courts.

Thereupon the plaintiff brought this action, joining as defendants all other lot owners in the park, and praying for a declaratory judgment to the effect that the land in the park then remaining in his ownership was not subject to any restriction as to the size of plot to be sold. There was a demand for incidental and general relief.

The trial judge held that no common or uniform plan had been established either by the deeds themselves or by acts or representations extrinsic thereto, and that neither the one-acre nor the half-acre limitation is a restriction upon the plaintiff in disposing of the land retained.

The Appellate Division held that the effect of the deed to Farnham is to impose a restriction upon the whole of Greeley Park so as to make a half-acre lot the minimum unit of subdivision; that the restriction flows from the deed itself, which is of record, and does " not result from any parol representations alleged to have been made to purchasers," and that the plaintiff and his subsequent grantees are bound thereby.

In this court there are cross-appeals. The defendants Woodward and the 1181 Second Avenue Corporation complain that the unit of subdivision applicable to other lots has been declared to be a half acre rather than an acre. The plaintiff complains that subdivision has been limited at all.

We think the Farnham deed standing by itself does not import a covenant on the part of the grantor to charge the land which he retained with the same restriction as to acreage assumed by the grantee. If we have regard to form alone, the covenants of the deed are those of the grantee and no one else. If we go beyond the

form, there is no evidence that a uniform size of plot through the whole area of the park was put forward to buyers in the beginnings of the project as a feature of the scheme. No assurance of uniformity was to be gathered from the map itself, which delineated plots of irregular shape and varying dimensions. No assurance of uniformity was to be gathered from parol representations, for none, so far as it appears, were made. Undoubtedly the inference may be drawn from the deed without more that the grantor conceived himself to be subject to reciprocal burdens of some kind. Up to a certain point at least there was to be a measure of correspondence between his own obligations and those assumed by the grantee. This is manifest from the description of the property as a park. It is manifest again from the reservation of the right to build a " lodge, apartment house, water supply system, lecture hall or public building " upon the property unsold. The implication is that subject to this reservation (which is wrought, as we have seen, into covenant No. 2) there shall be adherence by the grantor in the improvement of the land unsold to the restriction against use for business imposed on the grantee. We cannot say, however, from the form of the deed alone that there has been a disclosure of an intention to make the eight covenants reciprocal in all their length and breadth. What was written in the deed may have been enough in the event of later sales to put a purchaser upon inquiry. It may have charged him with the duty of ascertaining the covenants or restrictions, if any, that were inherent in the plan, though extrinsic to the record. Even so, the deed without more does not tell us what they were (*Sprague* v. *Kimball*, 213 Mass. 380, 382).

If the deed be insufficient without supplement or commentary, the question remains whether at the time of its delivery there was disclosure of a purpose to make the covenants reciprocal. We put aside for the moment any question of law as to the effect of the disclosure,

and consider the fact alone. The evidence points to the conclusion that at the time of the Farnham deed, the plaintiff had in mind that he would impose like restrictions as to area upon the other lots unsold. This is indicated by the fact that upon copies of the map retained in his possession, he indorsed a printed form of deed similar to the Farnham deed in the substance of its covenants. Indeed, he admits as much in his pleadings in the present suit. The difficulty is that the plan thus conceived never went beyond the stage of conception so as to realize itself in act. A scheme for uniform improvement, if it is to lay the basis for the implication of reciprocal restrictions on the part of a grantor, must at least have been made known to the grantee, and that definitely and clearly (*Reid* v. *Bickerstaff*, L. R. [1909] 2 Ch. 305, 319, 320). In saying this, we are assuming provisionally that it becomes operative then. Here the condition of disclosure is not shown to have been satisfied. The grantor did not exhibit to Farnham the indorsement on the map. At the time of the Farnham deed the map did not exist. He did not even exhibit the indorsement at the time of the later sale to Woodward, though the map (without the indorsement) had then been filed. There is no contention on the part of any one that adherence to the varying lines and shapes exhibited on the map was understood to be a duty whenever sales were made thereafter. As to Farnham and Woodward alike, the scope of the community scheme, except to the extent that it was to be gathered from the deeds themselves, was as much undisclosed as if the project were still locked in the brain of the projector. A statement of a plan, though evidenced by a writing, does not make local law for the lands of a community (*Reid* v. *Bickerstaff*, *supra*), unless brought home to the community members by appropriate disclosure. Till then, it is still *in fieri*. Servitudes do not result by implication from a subjective state of mind.

General pronouncements in the books as to the purpose and effect of equitable restrictions are likely to mislead unless read with discrimination as to the facts. "Before a stranger to a conveyance may assert rights based upon a covenant or restriction, 'there must be found somewhere the clear intent to establish the restriction for the benefit of the party suing or his grantor, of which right the defendant must have either actual or constructive notice'" (*Vogeler* v. *Alwyn Imp. Corp.*, 247 N. Y. 131, 136, citing *Equitable L. Assur. Soc.* v. *Brennan*, 148 N. Y. 661). The facts must be scrutinized to ascertain whether there is a servitude at all, and, if so, the zone and the incidence of benefit and burden. One who imposes a restriction upon buyers of his land may have in mind benefit to himself, or benefit to others (*Korn* v. *Campbell*, 192 N. Y. 490). If all that he has in mind is benefit personal to himself, the buyers, though subject to the restrictions, do not succeed to the right to enforce it *inter se* (*Equitable L. Assur. Soc.* v. *Brennan, supra; Korn* v. *Campbell, supra;* Stone, The Equitable Rights and Liabilities of Strangers to a Contract, 19 Col. L. Rev. 177, 181). On the other hand, if the purpose of the restriction is benefit to other owners, present and prospective, the right of action is not confined to the nominal covenantee, but passes upon each conveyance to successive buyers of the lots within the area of benefit (*Barrow* v. *Richard*, 8 Paige, 351; *Brouwer* v. *Jones*, 23 Barb. 153; *Parker* v. *Nightingale*, 6 Allen, 341; *Lattimer* v. *Livermore*, 72 N. Y. 174; *Vogeler* v. *Alwyn Imp. Corp., supra;* Stone, *supra,* pp. 182, 185). The holders of lots B and C, the subject of later sales, may then enforce the restriction against the first buyer, the holder of lot A, and the holder of lot A may enforce the restriction if thereafter imposed on the buyers of B and C. (Stone, *supra,* pp. 185, 187; 2 Tiffany on Real Prop. pp. 1442, 1450).

The question before us here is of a very different order. We are not concerned to inquire whether Wood-

ward may enforce the covenant against Farnham or against some holder of a later deed who has been subjected to a like restraint. What concerns us now is whether there has been an implied covenant by Bristol that in every future deed a like restraint shall be contained. To say that the several lot owners are to have the benefit of the servitudes, if created, is one thing. To say that the common grantor is under a continuing duty to create them is obviously quite another (*Sprague* v. *Kimball, supra*). If restrictions evidenced by covenant and binding in their terms upon the land of the grantee, are to be read as meaning that the grantor imposes a like restriction upon any land retained by him, the inference may not be drawn without something to show that exact uniformity in respect of all restrictions was of the essence of the project (*Spicer* v. *Martin*, 14 A. C. 12; *In re Birmingham, etc., Co.*, [1893] 1 Ch. 342; *Reid* v. *Brickerstaff, supra*, at 319, 320; *Collins* v. *Castle*, 36 Ch. Div. 243; *Shoyer* v. *Mermelstein*, 93 N. J. Eq. 57; *De Gray* v. *Monmouth Beach Club House Co.*, 50 N. J. Eq. 329, 338; *Sanborn* v. *McLean*, 233 Mich. 227; *Summers* v. *Beeler*, 90 Md. 474; *Bimson* v. *Bultman*, 3 App. Div. 198, 201; *Turner* v. *Howard*, 10 App. Div. 555). Buyers must have been invited " to come in and purchase on the footing that the whole of the property offered for sale was to be bound by one general law " as to the size of the lots and the character of the buildings (*Spicer* v. *Martin, supra; Reid* v. *Brickerstaff, supra*). We cannot find that evidence in the Farnham deed alone or in any plan or representations contemporaneously revealed or made. To this we add that Farnham's successor in interest, Cramer, has been joined as a defendant, and makes no claim for the extension of the restriction throughout the area of the park.

If the Farnham deed alone or in its setting does not lay the basis for the inference of a reciprocal covenant on the part of the grantor, the like must obviously be true of the deed to Woodward, since the finding is that

there was nothing in the form of covenant or representation beyond the deed itself. Indeed the implication is more difficult in the case of this deed than in that of the other, for both the size of the lots as marked on the map and the covenants of Farnham's deed repel the acceptance of a one-acre lot as the standard of uniformity, with the result that any covenant to be implied must be something less than reciprocal. When we pass to the later deed of lots 11 and 12 to the defendant corporation, the problem, however, becomes different. Before that deed was made, there had been exhibited to Woodward the two descriptive pamphlets with their florid picture of the beauties of the several parks leading up, as we shall assume, to what in substance was a statement that sales were to be made in acre and half-acre parcels, but that the latter would be the minimum. Included in the pamphlets were photographs of Woodward's house. There is no evidence that he looked at the writings except perhaps to glance at the pictures and smile at the hyperboles. There is no evidence that he was moved by anything there read to contract for the additional land and later to acquire the deed. Indeed, as we have already pointed out, his verified answer suggests the contrary. He does not say that he had even received the pamphlets before assenting to the purchase, and there is only a vague statement of his " imaginings " to indicate that he had received them before the delivery of the deed. We cannot say that such testimony is so definite and persuasive as to make the promise of a reciprocal restriction an inference of law. Least of all can this be said where the prayer is to a court of equity for its discretionary remedies (*Forstmann* v. *Joray Holding Co., Inc.*, 244 N. Y. 22; *Shakespeare* v. *Markham*, 72 N. Y. 400). Whatever representations had been made were uncertain as to time and meaning. As to this, the Appellate Division did not differ from the trial judge, but put its ruling on the deeds alone. If error was

committed, it was not one of law. The facts, if subject to conflicting inferences, have been conclusively adjudged below.

What has been written has assumed that parol representations, if adequately proved, may be effective to add to the obligations of a deed. How far and in what circumstances they have value to that end is an inquiry that brings us to one of the battlefields of the law. Only recently an author of learning has surveyed the terrain of the strife, and has charted the monuments with clarity and precision (Charles E. Clark, Real Covenants and Interests Running with the Land, ch. VI, p. 148, *et seq.*). One view of these restrictions treats them as contracts concerning or relating to the enjoyment of the land, to be specifically enforced against the promisee or against purchasers with notice, but inoperative as a conveyance of any interest in the land itself (Clark, *supra*, p. 149; 2 Tiffany, Real Prop. pp. 1425, 1438; Stone, The Equitable Rights and Liabilities of Strangers to a Contract, 18 Col. L. Rev. 291; 19 id. 177; Ames, Lectures on Legal History, 381; Giddings, Restrictions on the Use of Land, 5 Harv. L. Rev. 274; *Lewis* v. *Gollner*, 129 N. Y. 227; *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440, 447; *Hodge* v. *Sloan*, 107 N. Y. 244, 250; *Tallmadge* v. *East River Bank*, 26 N. Y. 105). Where that view prevails, the Statute of Frauds is held to be irrelevant (Clark, *supra*, 157; Tiffany, *supra*, p. 1430; *Lewis* v. *Gollner*, *supra*, at pp. 233, 235; *Mattikow* v. *Sudarsky*, 248 N. Y. 404; *Hall* v. *Solomon*, 61 Conn. 476; *Johnson* v. *Mt. Baker Pk. Church*, 113 Wash. 458). The other view treats the restrictions, though equitable in origin, as creating interests in the land itself, like easements at common law (Pound, Progress of the Law, 33 Harv. L. Rev. 813; Pomeroy, Eq. Jur. [4th ed.] §§ 1295, 1296; Clark, *supra*, p. 149). Where that view prevails, the Statute of Frauds is generally applied (*Sprague* v. *Kimball, supra; Davis* v. *Robinson*, 189 N. C. 589; 38 Harv. L. Rev.

967, 971), subject, of course, to the usual exceptions on the ground of fraud or part performance (*Newman* v. *Nellis*, 97 N. Y. 285; *Canda* v. *Totten*, 157 N. Y. 281).

Difficulties there are in either view if the underlying concept is pressed to the limit of its logic. If we regard the restriction from the point of view of contract, there is trouble in understanding how the purchaser of lot A can gain a right to enforce the restriction against the later purchaser of lot B without an extraordinary extension of *Lawrence* v. *Fox* (20 N. Y. 268). Ingenious answers to this objection will be found in a learned essay by Dean (now Mr. Justice) STONE (19 Col. L. Rev. at p. 187) as well as in the writings of Mr. Tiffany and others. Perhaps it is enough to say that the extension of the doctrine, even if illogical, has been made too often and too consistently to permit withdrawal or retreat. It is significant that the whole doctrine of the right of recovery by a third party beneficiary, a stranger to the contract, was anathema in its beginnings to those who were inclined to put symmetry in the first place and efficiency in the second (See *Jacobs & Young* v. *Kent*, 230 N. Y. 239, 242; and see Hening, History of the Beneficiary's Action in Assumpsit, printed in 3 Select Essays in Anglo American Legal History, pp. 339, 340). On the other hand, if a covenant of restriction, laying a burden on the use such as did not run with the land by common-law tests of privity and tenure (Stone, id. 18 Col. L. Rev. at pp. 293, 294; Clark, *supra*, p. 113; *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440, 449; *Miller* v. *Clary*, 210 N. Y. 127; *De Gray* v. *Monmouth Beach Club House Co.*, *supra*), is to be viewed as creating what is strictly a servitude or easement, there is difficulty in squaring its present character with its equitable origin (Clark, id. p. 154).

We do not need to choose now between these conflicting methods of approach, though the cases in this State show what is a tendency, if no more, to arrive at

a solution of the problem through the avenue of contract (*Lewis* v. *Gollner, supra; Trustees of Columbia College* v. *Thacher*, 87 N. Y. 311, 316). Each of the two methods will doubtless have contributed a share to the ultimate generalization. In the end we may find that they have come together so often and in so many ways that there is no longer space between the paths, no longer choice to make between them. What began as a contractual right may be so protected by remedies, legal and equitable, that it will be indistinguishable from a real interest, a title to the land itself. What has thus developed into an interest may retain such traces and reminiscences of its contractual history that for the purpose of the Statute of Frauds, its quality will be determined according to its origin (as to Personal Prop. Law [Cons. Laws, ch. 41], § 31, subd. 1, see *Ward* v. *Hasbrouck*, 169 N. Y. 407, 419; *Brick* v. *Gannar*, 36 Hun, 52; *Great Western Turnpike Co.* v. *Shafer*, 57 App. Div. 331; 172 N. Y. 662; *Worley* v. *Sire*, 111 Ind. 238; *Stem* v. *Nysonger*, 69 Iowa, 512).

The ultimate generalization is not for this case, but for the future. We assume for present purposes that parol representations and promises are effective, if proved, to establish a restriction. The defendants appealing are not helped by the assumption, for as to them the proof has failed. We place our judgment on that ground.

The judgment of the Appellate Division should be reversed and that of the Special Term affirmed, with costs to the plaintiff in the Appellate Division and in this court.

POUND, CRANE, LEHMAN, KELLOGG and O'BRIEN, JJ., concur; HUBBS, J., not sitting.

Judgment accordingly.