UNITED STATES of America,

v.

Guido GULLA, Vito Gulla, and GUIDO IMPORTER AND WHOLESALER, INC., Defendants.

No. 92 Cr. 1236 (VLB).

United States District Court, S.D. New York.

Sept. 13, 1993.

Alan J. Brudner, Asst. U.S. Atty., New York City, for U.S.

Alan Levine, Kronish, Lieb, Weiner & Hellman, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

Nations in the European Economic Community ("EEC") have imposed restrictions on the importation of hormone-containing meat products produced in the United States. A Presidential finding, citing no sources, has been made to the effect that the hormones in those meat products are not harmful to human health. To induce the EEC nations to

remove the import restrictions on those American meat products, the United States by Executive action has increased the importation duty on selected vegetable products: an increase from 13.6% to 100% has been applied to tomatoes, but not to tomato sauce.

This case involves criminal charges that false documents were used to avoid application of the increase in duty to tomato products imported by the defendants. In essence the Government charges that defendants imported tomatoes but declared that they were importing tomato sauce. Violations of 18 USC §§ 371, 542 and 1001 are alleged.

Defendants have moved to dismiss the indictment in this case on the ground that the distinction between "tomatoes" dutiable at 100% and "tomato sauce" dutiable at 13.6% is unconstitutionally vague on its face, and also as applied to defendants: they note that Customs previously and subsequently cleared identical imports by defendants. Defendants have also moved to dismiss certain counts and paragraphs of the indictment, for a bill of particulars, and to suppress statements made during a search of the corporate defendant's premises pursuant to warrant.

I find difficulty in sustaining the rationality or comprehensibility of the tomato/tomato sauce distinction. I also have difficulty in squaring the Executive action taken—that of raising duties five-fold on products not involved in the dispute with the EEC nations—with the Origination Clause of the Constitution, which requires that measures to raise revenue originate in the House of Representatives. Const., Art. I § 7, Cl. 1.

■ In ruling upon defendants' motions addressed to the indictment, however, I must consider what is charged in the indictment, and as a practical matter I must assume that the Government can prove the elements of the crimes charged. The indictment charges substantively and as a conspiracy, the making of deliberately false statements to the Customs Service.

■ Making deliberately false statements is not an acceptable way to mount a constitutional challenge. Possible invalidity of the tomato/tomato sauce distinction, as a determinant of duty or as a distinction importers were required to honor under the conceded circumstances here, would not mean that deliberately entering a product defendants themselves regarded as "tomatoes" under the rubric of "sauce" can be excused. In fact, such a covert constitutional challenge would give persons or entities in the position of defendants a competitive advantage over business rivals who chose either to pay the 100% duty on tomatoes or to incur the expense and potential delay of litigating the validity of the distinction. Use of deliberate false statements, if condoned by the courts, would deprive the consuming public (which must ultimately pay the retaliatory duty), the Customs Service and the courts of the ability to make decisions about the issues at stake on an all-facts-known basis. Statements affecting asserted customs duties, whether those duties are valid or invalid, are material to Customs administration and within the jurisdiction of the Customs Service, and thus cognizable under 18 USC § 1001.

I deny defendants' motions except that:

(a) I direct certain additional discovery as set forth below;

(b) The United States Attorney must elect as to certain counts and paragraphs of the indictment, or must explain after further consideration why they are necessary, as set forth below;

(c) I shall set forth in a separate memorandum order my disposition of defendants' motion under Fed.R.Cr.P. 12(b)(3) and 41(f) to suppress evidence obtained through conversations with the defendants during a search of the corporate defendant's premises.

The parties are directed to submit memoranda of law accompanying their proposed instructions to the jury concerning the defendants' assertion that a civil Customs inquiry with respect to the tomato product at issue in the indictment led to its "liquidation" favorably to defendants.[1]

---

1. "Liquidation" is a term of art in the Customs duties field: it means that an importation is administratively approved for entry at a given rate.

## II

The indictment charges violations of:

(a) 18 USC § 542, which prohibits entry of goods through United States Customs by means of false statements;

(b) the more general provisions of 18 USC § 1001, which prohibits false statements within the jurisdiction of government agencies; and

(c) 18 USC § 371, which prohibits conspiracies to violate other federal criminal laws, including 18 USC §§ 542 and 1001.

The false statements charged consisted in characterizing "tomatoes" as "tomato sauce."

 The Second Circuit held in *United States v. Avelino*, 967 F.2d 815 (2d Cir.1992) that false statements must be material to be prosecutable under 18 USC § 1001. This precaution is necessary to avoid criminalizing entirely irrelevant assertions. I find that the nature of a product entered through Customs is necessarily material not merely to administration of the Customs laws, but to any determination as to whether or not the duty imposed or the characterizations at issue are valid. Similar observations apply to 18 USC § 542.[2]

## III

On December 30, 1987, acting under § 301 of the Trade Act of 1974 as amended, 19 USC §§ 2411 and 2483, President Reagan increased from 13.6% to 100% U.S. Customs duties on various food products imported from the European Community including tomatoes in retaliation for decisions of the European Economic Community barring U.S.

meat exports containing hormone residues. 52 Fed.Reg. No. 250, p. 49131.[3]

The tomato duty was increased by Part 2, Subpart B of the appendix to the Tariff Schedules of the United States, 19 USC § 1202, item 946.42 and 9903.23.15, modified so as not to include tomato sauces by 54 Fed.Reg. No. 235, p. 50673 (Dec. 8, 1989).

The underlying trade dispute, generating the retaliatory duty on which this indictment is based, had nothing whatever to do with tomatoes or other vegetable products. President Reagan's Determination[4] stated that the European Economic Community had insisted "against the weight of scientific evidence, that consumption of meat from animals treated with growth hormones is dangerous to human health." No data supporting President Reagan's Determination were cited, nor was any indication provided as to whether the view described was substantially controverted by other experts.[5]

 Questions raised by this sequence of events do not justify dismissal of the indictment at this stage, because if the facts alleged in the indictment are proven, defendants chose not to contest the 100% duty head on, but to bypass these issues through deliberate use of false documents. Issues presented by the imposition of the 100% duty under the circumstances here do, however, justify a heightened level of scrutiny with regard to the adequacy of notice furnished to defendants, leading me (a) to order additional discovery relevant to that subject, and (b) to direct that memoranda of law be submitted as to appropriate instructions to the jury

2. The parties are directed to submit memoranda of law concerning whether or not materiality is a question which must be submitted to the jury.

3. The increase in duties on tomatoes was suspended for varying periods of time not relevant here.

4. This Determination was made under Section 301 of the Trade Act of 1974, 52 Fed.Reg. No 52 at 49139 (Dec. 30, 1987), accompanying Proclamation 5759, Dec. 24, 1987, 23 Weekly Compilation of Presidential Documents No 51 at 1555.

5. International controversies over health criteria for admission of food products have a long history, often leading to proposals for joint examina-

tion of scientific aspects with a view to benefitting industries in each country. See William McKinley, *Third Annual Message*, Dec. 5, 1899, 2 *State of the Union Messages of the Presidents* 1945 (1966). Although a U.S. request for disapproval of the European position by the General Agreement on Tariffs and Trade ("GATT") was unsuccessful, President Reagan criticized European unwillingness to cooperate in joint examination of the merits of the European ban on meats derived from hormone-fed animals. No details were set forth, nor was there any indication that two-way examination of barriers on both sides of the bargaining table was proposed in connection with this dispute.

concerning the effect of subsequent Customs "liquidation" of defendants' tomato product in a manner favorable to defendants.

## IV

■ Clear warning that conduct is criminal is a prerequisite to prosecution.

[F]undamental principles of due process ... mandate that no individual be forced to speculate, at peril of indictment, whether ... conduct is prohibited ... Thus, to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not 'plainly and unmistakably' proscribed.

*Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979); see also *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957); and see *United States v. MacKenzie,* 777 F.2d 811, 817 (2d Cir.1985), *cert. denied* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

The underlying criminal statutes prohibit, in matters involving Customs under the circumstances alleged here, intentional false statements (18 USC §§ 542 and 1001), agreements to engage in such conduct (18 USC § 371), and aiding and abetting such conduct (18 USC § 2).

■ Defendants claim that the definitions of "tomatoes" and "tomato sauce" shade into each other to such an extent as to make incorrect selection between these definitions not punishable by criminal prosecution. To the extent that this issue was presented on the face of published documents, defendants were required to pursue it by challenging the distinction by the means available as discussed below, rather than by deliberately ignoring the distinction and resorting to deliberate false statements (if the allegations in the indictment are true). To the extent that defendants' argument depends on the nature of the tomato processing industry and the precise nature of defendants' wares, it pres-

ents a fact-intensive issue not capable of resolution on the face of published documents together with the indictment, and accordingly must be determined at trial.

Defendants assert, further, that Customs procedures designed to give adequate notice of problems arising in administration of Customs requirements, as well as of the provisions at issue here, were ignored with prejudicial consequences to the defendants. This is likewise an issue for resolution at trial.

Additional judicial responses to the issue of vagueness presented by defendants are, however, both possible and appropriate.

## V

■ Where an interest of constitutional dimension is implicated such as that of clear notice prior to risk of prosecution, the strength of the countervailing governmental interest, although not an excuse for violating constitutional rights, is relevant to the level of scrutiny required.

When a statutory classification interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests, and is closely tailored to effectuate only those interests.

*Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978); see Sullivan, "Unconstitutional Conditions," 102 Harv.L.Rev. 1415 (1989).

While Customs duties have been a significant source of federal revenue since the formation of the Republic,[6] the distinction at issue here is not claimed to be any part of a revenue measure. Nor is there any claim that tomato imports must be discouraged, as are imports of various undesired products. There is no assertion that the domestic tomato industry requires protection from injury due to imports. Nor is there any suggestion that the interests of United States foreign or diplomatic policy, or the requests of an international organization of which the United States is a member, are implicated.

---

**6.** See, e.g., fact pattern involved in *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S.

(18 How.) 272, 15 L.Ed. 372 (1855).

Instead, the sudden more-than-fivefold increase of the tomato duty to 100% was explicitly defined by the President as a retaliatory duty to penalize foreign countries for rejecting United States exports on health grounds.[7]

Trade retaliation, striking at importers of vegetables and innocent U.S. consumers (who must pay more) in order to protect sales of a domestic industry (meat from animals given hormones) strains the limits of minimal rationality.[8]

Consumer interests injured by the 100% tariffs imposed here are far more diffuse than the interests purportedly benefitted by the retaliatory coercion sought to be exerted;[9] the resulting imbalance is somewhat analogous to that presented when interests outside a state, with relatively little local political clout, are adversely affected by measures sought by local interests within the state.[10] Such an imbalance, while insufficient by itself to raise an independent constitutional question as to the validity of a legislative choice, is relevant to how courts should approach application of impositions of the type at issue here:

> ... it is not with a view to infractions of the Constitution only, that the independence of the judges may be an essential safeguard against the effects of occasional ill humors in the society. These sometimes extend no farther than to the injury of the private rights of particular classes of citizens, by unjust and partial laws. Here also the firmness of the judicial magistracy is of vast importance in mitigating the severity and confining the operation of such laws.

*The Federalist* No 78 (Hamilton).[11]

We must consider the application to the problem presented of broadly phrased constitutional provisions such as the due process clauses of the Fifth and Fourteenth Amendments.[12] Where the underlying governmental interest is weak or the governmental requirement raises serious constitutional questions of its own, a higher level of scrutiny is called for in connection with the requirement of notice.

---

**7.** Memorandum from the President to the United States Trade Representative accompanying Proclamation 5759, Dec. 24, 1987, 23 Weekly Compilation of Presidential Documents No 51 at 1555.

**8.** Promotion of exports by retaliation against recalcitrant foreign countries for allegedly improper objections to claimed hazards of U.S. products has a stimulative effect on the economy in much the same way as expansion of the money supply in some other manner, e.g., creation of credit for research and development (see Business Roundtable, "Strategy for a Vital U.S. Economy" at 31 [1984]) or other income-producing activities.

See J. Hallman, R. Porter & D. Small, *M2 Per Unit of Potential GNP as an Anchor for the Price Level*, Staff Study 157, Board of Governors, Federal Reserve System (April 1989); Alexander Hamilton, National Bank, Report to Congress by the Secretary of the Treasury, Dec. 13, 1790, 3 *Works of Alexander Hamilton* 106 (1950).

**9.** See, e.g., Baldwin, "Pressure Politics and Consumer Interests," Pub. Opin. Q. 102 (March 1941). The consumer interest is adversely affected not merely by the additional cost directly incurred, but by the inflationary tendencies sparked by dramatic price increases in any segment of the economy.

**10.** This principle was articulated by Chief Justice Stone in *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767–68 n. 2, 65 S.Ct. 1515, 1519 n. 2, 89 L.Ed. 1915 (1945):

> [T]he Court has often recognized that to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.

See *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Nippert v. Richmond,* 327 U.S. 416, 434, 66 S.Ct. 586, 595, 90 L.Ed. 760 (1946); *Edwards v. California,* 314 U.S. 160, 174, 62 S.Ct. 164, 167, 86 L.Ed. 119 (1941); *South Carolina Highway Dept. v. Barnwell Bros.,* 303 U.S. 177, 184–85 n. 2, 58 S.Ct. 510, 513–14 n. 2, 82 L.Ed. 734 (1938).

**11.** N.Y. State Admin.Proc. Act § 102(10), enacted by N.Y. L.1991 ch 668, goes much further than Hamilton, and acknowledges in statutory form that an enforcement tribunal may decide not to enforce an administratively promulgated rule "because the rule lacks a public benefit."

**12.** *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938); Dowling, "The Methods of Mr. Justice Stone in Constitutional Cases," 41 Colum.L.Rev. 1160 (1941); Powell, "Carolene Products Revisited," 82 Colum.L.Rev. 1087 (1982).

The imbalance might also have induced me to evaluate the rationality of the fine distinctions which importers of tomato products were required to draw in their entries, if that question had been confronted head on rather than through the use of false entries.

■ Emergency situations do not obliterate constitutional guarantees, but are relevant to their application; conversely, the absence of urgency eliminates any claim that necessity justifies otherwise dubious measures.[13]

This is not a case in which the only possibilities are that either United States vegetable consumers or domestic meat producers utilizing hormone animal feed must suffer, so that a choice as to which one will be hurt is inevitable. *Miller v. Schoene*, 276 U.S. 272, 279, 48 S.Ct. 246, 247, 72 L.Ed. 568 (1928). Were trade retaliation deemed necessary,[14] a duty increase covering more products with a lower percentage increase might have exerted similar pressure.[15]

In the decision to impose the 100% duties, no balance was articulated between harm to U.S. users of imported products injured by increases of duty from 13.6% to 100% and potential benefit to domestic meat producers. Adjustment assistance to compensate for harm from imports is authorized by 19 USC § 2251 *et seq.*, 19 USC § 2271 *et seq.* (assistance to displaced workers).[16] By contrast, no assistance is provided to ameliorate harm to U.S. users of imported products affected by a steep rise in duties imposed for retaliatory reasons.[17]

Inequality at the boundaries can be difficult to avoid in taxing statutes. Tax laws often create distinctions with at least some artificiality, and hence with the appearance of arbitrariness. See *Watkins v. Blinzinger*, 789 F.2d 474 (7th Cir.1986); see also Taussig, *Tariff History of the United States* (8th ed. 1931). While minimal rationality is required, it is difficult to establish its presence or absence in the tax context. *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983).

Here no revenue objective for the more than five-fold increase in duties on tomatoes is articulated in the administrative document imposing the duty, in any accompanying explanation, or in the underlying statutes, nor can it be inferred from circumstances. Sharp distinctions with no evident or readily inferred basis are drawn between

(a) the beneficiary (meat) industry sought to be protected from foreign trade barriers through retaliation, and

---

13. This principle is exemplified by the toleration of imposition of drastic interim relief without notice when, but only when, a genuine necessity is established. See *Connecticut v. Doehr*, —— U.S. ——, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); *In re Vuitton et fils, SA*, 606 F.2d 1 (2d Cir.1979); *Federal Home Loan Mortgage Corp. v. Spark Tarrytown*, 813 F.Supp. 234 (S.D.N.Y.1993).

14. Some contend that trade restraints are counterproductive because they impose restrictions on choices of domestic industrial or consumer buyers regardless of any other effect. See Sykes, "Countervailing Duty Legislation: An Economic Perspective," 89 Colum.L.Rev. 199 (1989); Lindsey, "Reciprocity for Disaster," 23 Reason: Free Minds and Free Markets No. 4 at 39 (Aug./Sept. 1991); J. McGurrin, *Bourke Cockran, A Free Lance in American Politics* 82 (1948, 1972) (address in London of early U.S. mentor of Winston Churchill, July 1903).

The Omnibus Trade and Competitiveness Act, which is asserted as the authority for the 100% duty at issue in this case, pinpoints the underlying challenge as overcoming "inadequate growth in the productivity and competitiveness of United States firms and industries ..." Public Law 100–418, 102 Stat. 1107, § 1001(2)(3)(H). See

M. Bailey & A. Chakrabarti, *Innovation and the Productivity Crisis* (1988); C. Freeman, *Unemployment and Technological Innovation* (1982); J. Burke, *Connections* (1978); N. Terleckyj, *Effects of R & D on the Productivity Growth of Industries* (1974); Worsinger, "New Technologies and Antitrust," 47 N.Y.S.B.J. 651 (1975), also in 81 Case & Commentary 33 (1976); Business Roundtable, "Strategy for a Vital U.S. Economy" at 31 (1984); Business Week, "Cover Story" at 62 (July 4, 1982); Bernstein & Nadiri, "Research and Development and Intra–Industry Spillovers," NYU Dept. of Econ. # 88–06 at 1 (Feb. 1988).

15. Export dependency created by forced-draft market entry is not necessarily an advantage. See George, "Japan's America Problem," 14 Wash Q. No. 3 at 5 (Summer 1991).

16. See Reicher, "The Trade Adjustment Bills: Their Purpose and Efficacy," 61 Colum.L.Rev. 940 (1961); Wilcox, "Relief for the Victims of Tariff Cuts," 40 Amer.Econ.Rev. 884 (1950).

17. Compare Trevaskis, "Measure of Damages for Regulatory Takings," 3 Probate & Property 17 (ABA Mar./Apr.1989).

(b) the importers who are injured without compensation, and also between

(i) tomatoes and

(ii) tomato sauce.

■ The weakness of the governmental interest in applying such fine distinctions for purposes of imposing a highly selective duty increase affecting the tomato importing industry in order to protect the unrelated meat industry is underlined by the equal protection issues implicit in the situation.[18]

## VI

A further question raised by the 100% duty underlying the indictment here is that it amounts to an increase in a tax by Executive action. Article I § 8, cl. 1 provides that "Congress shall have the power to lay and collect taxes, duties, imposts and excises," and to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers ..." Art. I § 8, cl. 18. This is further limited by the Origination Clause, Art. I § 7, which provides that "All bills for raising revenue shall originate in the House of Representatives ..."

None of these constitutional provisions makes any distinction between Customs duties and other means of raising revenue, a fact particularly telling given the primacy of Customs as the first major source of revenue of the United States during the early decades of its existence.[19]

Steps for "raising" revenue are, however, differentiated by the constitutional text from *reductions* in customs duties or other financial charges, which have since 1934 been permitted to be negotiated by the Executive Branch through reciprocal trade arrangements with foreign nations.[20] While a revenue objective was disclaimed in regard to the 100% duty at issue here, mechanically that 100% duty is certainly a measure for raising revenue; and it did not originate in the House of Representatives.

■ The concept that it is the legislature—not the executive through legislative designation—which may impose tax burdens traces back to Chapter 12 of the Great Charter of King John of 1215 (Magna Carta), which provides:

No scutage nor aid shall be imposed in our kingdom, unless by the common council of our kingdom ...

The Petition of Right (1628) requests:

... no man hereafter be compelled to make or yield any gift, loan, benevolence, tax, or like charge, without common consent by Act of Parliament ... [21]

The basic modern legislative source of U.S. Customs duties is the Smoot–Hawley Tariff Act of 1930 as enacted by Congress and subsequently amended (19 USC § 3002). Under the Trade and Competitiveness Act of 1988, Public Law 100–418, 102 Stat. 1107, the President is authorized to promulgate a Harmonized Tariff Schedule to conform previously enacted duties to statutory provisions and approved trade agreements. 19 USC § 3004.

---

18. The concept of equal protection made applicable to the states by the Fourteenth Amendment is applicable to the federal government by virtue of the Fifth Amendment's due process guarantee. *United States Dept. of Agriculture v. Mareno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Lyng v. Costello*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (District of Columbia school desegregation case).

19. See *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855); *Cary v. Curtis*, 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1846).

20. See Reciprocal Trade Agreements Act, 48 Stat. 943 (1934), and successive extensions and modifications codified throughout Title 19, USC. For history, see Stewart, "Trade Agreements Legislation," in Foreign Trade Policy: Staff Report for the Subcommittee on Foreign Trade Policy, Committee on Ways & Means, Compendium of Papers on U.S. Foreign Trade Policy 507–557 (1958).

The Reciprocal Trade Agreements Act replaced the need for separate congressional authorization for each negotiation for mutual trade concessions. See, e.g., William McKinley, Third Annual Message, Dec. 6, 1899, 2 *State of the Union Messages of the Presidents* 1935 (1966).

21. N. Dowling, *Cases on Constitutional Law* 36 (5th ed. 1954).

Where Executive action reflects specifically legislated changes, carries out definable mandates with predictable results, acts in pre-defined ways upon verifiable findings, or reduces duties pursuant to international agreements, no substantial question under the Origination Clause is likely to be presented. Yet to be determined is whether in the context of a trade controversy § 301 of Public Law 100–418 (19 USC § 2411) does, or constitutionally can, permit the Executive, without supported factual findings, to increase duties on importers and domestic buyers of products unrelated to that trade controversy.

Ordinarily, where sovereign compulsion is to be imposed by Executive or judicial action on other than an emergency basis, a minimal requisite of reliable factfinding is provided for. See *Motor Vehicle Manufacturers Ass'n v. State Mutual Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Reference to unnamed expert opinion without citing any literature, and without identifying the source or prevalence of, or any support for, the views adopted, would ordinarily be inadequate as a basis for imposing legal consequences (much less a fivefold increase of duties on concededly innocent consumers and industries). See *Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir.1981). Were the experts relied upon identified, their partiality (compare *Trower v. Jones*, 121 Ill.2d 211, 117 Ill.Dec. 136, 520 N.E.2d 297 [1988]) and other indicia of strength or weakness of their contentions could be weighed. E. Imwinkelreid, *The Methods of Attacking Scientific Evidence* (1982).

Procedures customary in the domestic context may, it is true, be inapplicable where the President has invoked his constitutional power to conduct foreign affairs. See *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57

S.Ct. 216, 81 L.Ed. 255 (1936); see also *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). Here, however, only the economic interests of a different domestic industry, not the foreign affairs concerns of the United States, were involved. The authority of the Executive to impose trade restraints in circumstances involving threats to national security or the lives or property of United States citizens abroad, the taking of hostages, violation of United Nations Security Council or Organization of American States resolutions, establishment of dictatorial regimes, threats to peace and the like has not been invoked in, and does not appear involved in, the imposition of the 100% tomato duty in the present case.

If Executive action designed solely to promote given domestic economic interests at the expense of other domestic economic interests (here, the interests of importers and users of tomatoes originating in the European Community) need not be supported by factual findings flowing from disclosed evidence, and cannot be questioned because the governing standard is "drawn in such broad terms that in a given case there is no law to apply ...," *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), then the question of delegation of taxing power by Congress would come into sharp focus, particularly absent an emergency situation. See generally *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); Alexander, "Increased Judicial Scrutiny for the Administrative Crime," 77 Cornell L.Rev. 612 (1992).

Mercantilist trade restrictions, strictly enforced, contributed to the hostility toward Britain leading up to the American Revolution.[22] Such restrictions enjoy no special status justifying departures from otherwise applicable requirements of the Constitution.[23]

---

**22.** J. Shepherd, *The Adams Chronicles* 25–26, 35 (1975); see also B. Tuchman, *The First Salute* ch. 1 (1988).

**23.** This may be one of those relatively rare situations in which it is possible to lay a constitutional provision "alongside" a proposed interpretation of a statute to "see if the latter squares with the

former." *United States v. Butler*, 297 U.S. 1, 62–63, 56 S.Ct. 312, 318, 80 L.Ed. 477 (1936); see *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); see also *Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise*, —— U.S. ——, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991).

If the 100% duty involved here crosses the line between execution of reasonably well defined tax legislation and Executive branch imposition of taxes, a constitutional violation may be involved. Such a violation is not, in any case, remediable by the self-help method of filing documents known to be false, as charged in the indictment. The implications of the constitutional questions raised are, instead, to call for additional discovery to permit careful scrutiny of the steps required to provide adequate warning of the potential falsity of the entries made by defendants here.

### VII

The tomato/tomato sauce distinction and its potential ambiguity were evident on the face of publicly filed documents even if the proper characterization of particular products may not have been. Against this background, the distinction may be vulnerable to anticipatory pre-enforcement challenge by an importer seeking to avoid the higher duty. See *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Wagner Seed Co. v. Daggett*, 800 F.2d 310 (2d Cir.1986).

An importer may ask for advice from a Customs import specialist, 19 CFR part 177, and file a protest with the Regional Commissioner under 19 USC § 1514, 19 CFR part 174. If still dissatisfied, he may file a civil complaint with the Court of International Trade under 28 USC § 1581, from which an appeal can be taken to the United States Court of Appeals for the Federal Circuit under 28 USC § 1295(a)(5).

In addition, 28 USC § 1581(h) provides: The Court of International Trade shall have exclusive jurisdiction over any civil action commenced to review, *prior to the importation of the goods involved,* a ruling issued by the Secretary of the Treasury, or refusal to issue or change such a ruling, relating to classification, valuation, rate of duty ... entry requirements ... or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation. (emphasis added).

If the Court of International Trade lacks jurisdiction under these provisions, declaratory or other relief under 28 USC §§ 1331 or 2201–2202 may be sought. If a definitive ruling adequate to protect the defendants from prosecution was refused notwithstanding a request, constitutional questions could be raised concerning exercise of sovereign compulsion without due process, to be determined by the judiciary. *Bartlett v. Bowen,* 816 F.2d 695 (D.C.Cir.), *reinstated* 824 F.2d 1240 (D.C.Cir.1987); *Marozsan v. United States,* 852 F.2d 1469, 1477–79 (7th Cir.1988) (en banc); see also *The Federalist* No 78 (Hamilton); Hart, "The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic," 66 Harv. L.Rev. 1362 (1953).

Courts seek to avoid such constitutional questions by construing applicable provisions as granting review wherever possible, absent other avenues of relief or such specialized circumstances as absence of any law to apply. See *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Lindahl v. OPM,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *Oestereich v. Selective Service Board,* 393 U.S. 233, 238, 89 S.Ct. 414, 417, 21 L.Ed.2d 402 (1968); *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 619–20, 32 S.Ct. 340, 344, 56 L.Ed. 570 (1912) (Hughes, J.).

Since neither pre-filing relief nor relief by means of a filing fully disclosing the issues now presented was sought, its unavailability cannot be assumed. The existence of this unexercised, potentially effective option prevents defendants from successfully challenging the indictment on its face. Otherwise, persons utilizing false statements to avoid assertedly unfair Customs or other charges would have a competitive advantage over those invoking their constitutionally protect-

ed[24] access to the courts to challenge an impost. The effect would be to engender "the contempt for law which the failure to enforce law inevitably produces." Theodore Roosevelt, Fifth Annual Message, Dec. 5, 1905, 3 State of the Union Messages of the Presidents 2145 (1966). Defying even an assertedly invalid requirement by means of false statements is not an acceptable option.

This barrier to direct attack on the Customs duty underlying the indictment does not, however, prevent defendants from claiming the right to close scrutiny of the adequacy of notice and the clarity of the requirement involved. I conclude that this scrutiny should occur at trial with the aid of augmented discovery rather than on a pretrial motion to dismiss the indictment.

## VIII

Differing types of tomato products may function as do some closely analogous legal doctrines which

> in the end … may … have come together so often and in so many ways that there is no longer space between the paths, no longer choice to make between them.

*Bristol v. Woodward,* 251 N.Y. 275, 289, 167 N.E. 441 (1929) (Cardozo, J.).

The structure of the tomato product industry may be such that the same item could be characterized in different ways, as can legal doctrines:

> [T]here are often two lines of authority, each of which is available to whatever side wishes to use them, and which may be used without reanalysis.

Oakes, "Book Review," 99 Harv.L.Rev. 862, 873 (1986).

In going beyond the face of the indictment in seeking pretrial dismissal of the indictment, however, defendants attempt to invoke

the equivalent of a motion for summary judgment in a criminal case. Unlike Fed. R.Civ.P. 56, and 28 USC § 1446(c)(5)[25] governing the removal of state criminal prosecutions to federal courts, the Federal Rules of Criminal Procedure contain no provision for a motion for summary judgment or its equivalent.

In some instances, the United States Attorney has waived this procedural objection to consideration of a fact-based motion on the merits, e.g., *United States v. Mongelli,* 794 F.Supp. 529, 530 (S.D.N.Y.1992). This has not occurred in the present case.

## IX

Defendants have moved to dismiss counts 17–21 (under 18 USC § 1001) and to strike paragraph 7 of count one (charging a conspiracy to violate § 1001) as duplicative. The prosecution argues that the Customs provision (18 USC § 542) covers procurement of false statements and that § 1001 does not. This is literally true, but ignores 18 USC § 2 which covers aiding and abetting of false statements within the jurisdiction of government agencies and other crimes against the United States.

Such matters may be deferred until the time of trial, or, indeed, sentencing in the event of conviction. Fed.R.Cr.P. 2, sentence 2, however, provides that the Criminal Rules

> shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.

See also Fed.R.Evid. 403. Elimination of unnecessary counts in an indictment prior to trial is of great importance in simplifying and accelerating trial, reducing expense to both prosecution and defense, and avoiding factfinder confusion.

---

**24.** See discussion and authorities cited, *Bartlett v. Bowen,* 816 F.2d 695 (D.C.Cir.), *reinstated* 824 F.2d 1240 (D.C.Cir.1987); *Maroszan v. United States,* 852 F.2d 1469, 1477–79 (7th Cir.1988); see also *Bates v. Arizona,* 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810 (1977); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Philadelphia Co v. Stimson,* 223 U.S. 605, 619–20, 32 S.Ct. 340, 344, 56 L.Ed. 570 (1912) (Hughes, J.).

**25.** "If the United States district court does not order the summary remand of [a state criminal] prosecution, it shall order an evidentiary hearing to be held promptly and after such hearing shall make such disposition of the prosecution as justice shall require." See also *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42 n. 2 (2d Cir. 1986), *cert. denied* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

Within ten (10) days after the date of this memorandum order, the United States Attorney shall indicate which counts or portions of counts may be dismissed on motion of the United States, or submit an affidavit explaining why all counts now pleaded are pragmatically necessary to prosecution of the case notwithstanding availability of 18 USC § 2.

### X

Defendants have submitted forty-nine (49) requests for particulars, consisting of eight (8) pages. The United States Attorney is directed to furnish to defendants:

(a) a pretrial list of premarked exhibits and copies of such exhibits, including, specifically identified as such, each document alleged to be false;

(b) to the extent not already furnished to defendants:

(i) the relevant quotations from each document claimed to furnish part of a chain of authority defining the Customs disclosures required of defendants;

(ii) all press releases or other documents generated to provide information about Customs requirements relevant to this case;

(iv) all internal reports, notes, official diary or log entries or other material relating to any Customs review of tomato products entered by any of the defendants as other than tomatoes since January 1, 1988;

(v) all statistical reports or other descriptive documents describing, by statistical or other means in general terms or by type (i.e. not in regard to specific Customs entries), kinds of tomato products entered through U.S. Customs since 1986;

(vi) all memoranda, bulletins, manual provisions, directives, planning documents or other guidance furnished to governmental employees relating to the administration of 100% duties imposed by promulgations cited in part III above, including but not limited to:

(A) material of these types relating to the giving of notice to importers or others concerning such matters;

(B) photographs, documents containing definitions, or other material relating to how Customs personnel would recognize differing tomato products referred to in documents cited in part III above or in documents furnished pursuant to this memorandum order;

(vii) all Census statistical or other published reports, and all other studies prepared or obtained subsequent to 1986, relating to the tomato and tomato products industries describing the types of such products produced, exported or imported which would indicate volume, description or characteristics of differing items, including tomatoes, tomatoes whole or in parts, tomato sauce and similar categories.

### XI

The materials called for above shall be made available for inspection and copying as they are secured by the United States Attorney, at times to be agreed upon by counsel for the parties.

SO ORDERED.